**William H. Sherlock, OSB #903816**
**lsherlock@eugenelaw.com**
HUTCHINSON COX
940 Willamette Street, Suite 400
P.O. Box 10886
Eugene, Oregon 97440
Telephone:    (541) 686-9160
Facsimile:    (541) 343-8693
Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

SPOKANE DIVISION

| | |
|---|---|
| **NORTH CASCADES CONSERVATION COUNCIL,** | **Case No. 2:22-cv-00293** |
| **Plaintiff,** | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | **Pursuant to Fed. R. Civ. P. 56** |
| **UNITED STATES FOREST SERVICE**, a federal agency of the United States Department of Agriculture, and **KRISTIN BAIL**, in her official capacity as Forest Supervisor, Okanogan-Wenatchee National Forest, United States Forest Service, | **Oral Argument Requested** |
| **Defendants.** | |

## MOTION

Plaintiff North Cascades Conservation Council ("NCCC") respectfully moves the

court for summary judgment under Fed. R. Civ. P. 56 on all counts of Plaintiff's First Claim

for Relief under the National Environmental Policy Act.[1] This Motion is supported by the

---

[1] Counsel for Plaintiff conferred with Counsel for Defendants on Plaintiff's intent to amend its Complaint to drop the Second Claim for Relief under the Federal Advisory Committee Act ("FACA"). Counsel for Defendants indicated they would not object, but also requested that Plaintiff make note of this in its Motion for Summary Judgment.

Page 1 – PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

court's record herein, the Administrative Record filed herein, the Declarations of Ric Bailey ("Bailey Dec.") and Michael Shaffer ("Shaffer Dec.") filed herewith, and the points and authorities below.

## I.    INTRODUCTION

NCCC's claim for relief alleges violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, by Defendants Kristin Bail and the United States Forest Service (together, "Federal Defendants") related to the Twisp Restoration Project ("TRP"). The TRP is a so-called "vegetation and aquatic restoration" project taking place across 37 square miles of the Okanogan-Wenatchee National Forest. TRP_AR_12593.[2] The Federal Defendants authorized the TRP on July 29, 2022, when Defendant Kristin Bail signed the Finding of No Significant Impact ("FONSI") allowing the TRP to move forward on the Environmental Assessment ("Final EA") issued approximately the same date. TRP_AR_12860; TRP_AR_12582.

The Final EA and the Federal Defendants' process leading to the Final EA and FONSI does not satisfy Federal Defendants' baseline legal obligations under NEPA. The Federal Defendants rely on "condition-based" analysis and management to evade the NEPA mandate to disclose site-specific actions and impacts before the agencies make decisions. As a result of this misplaced approach Defendants have arbitrarily and capriciously failed to consider a reasonable range of alternatives, failed to adequately disclose and analyze the full range of impacts of the TRP, failed to issue an environmental impact statement ("EIS") despite the TRP's significant environmental impacts, failed to

---

[2] Citations to the administrative record are formatted herein as TRP_AR_XXXXX.

adequately inform the public as required by NEPA, and failed to allow complete or meaningful public participation in the NEPA process.

The impacts associated with the proposed action will vary based on site-specific conditions including: vegetation community composition, soil-types, slopes, proximity to residences, proximity to aquatic resources, proximity to Class I airsheds, road construction needs, road maintenance status, volume and type of material burned, equipment used, volume of truck traffic, sensitive species habitat, etc., and those site-specific conditions are varied across the project landscape.

Because conditions vary throughout the planning area, the resulting impacts are expected to vary as well. The Final EA, however, does not contain the actual locations of the timber sales and harvest units or where the temporary roads will be built and therefore it cannot disclose, analyze, or describe the localized impacts that can potentially occur. Individual treatment project design and impact assessment will occur post-FONSI/Final EA, years after the public comment period has ended. This glaring lack of site-specificity hampers informed decision-making as part of the NEPA process, and therefore meaningful public participation on the individual treatment projects, both important for understanding the potential for significant impacts and determining mechanisms for avoiding them. This is the heart of the problem with condition-based management: conditions vary, topography varies, habitats vary, and so impacts of proposed logging, burning, and road construction will vary in ways that an analysis that ignores these variations cannot capture; and it prevents the public from responsibly commenting on such projects.

For these reasons, and as further shown below, NCCC requests that the court vacate the FONSI, enjoin the TRP from moving forward and remand this issue back to the Federal Defendants until such time as they fully comply with their obligations under the law.

## II.    FACTUAL BACKGROUND

The Federal Defendants initiated planning for the TRP no later than June 19, 2019. TRP_AR_06905. The public scoping announcement went out via letter on November 12, 2019. TRP_AR_07003. The letter provided only 30 days for comment on the preliminary details of the TRP. TRP_AR_07004. The Federal Defendants did not release the Draft Environmental Assessment ("Draft EA") until October 21, 2020. TRP_AR_07383–07625.

The Draft EA described a significantly larger project than the current TRP, TRP_AR_07388, for reasons described further below. The proposed action described in the Draft EA was a 77,037-acre "restoration" project. *Id.* Federal Defendants initially provided only 30 days for public comments, TRP_AR_07627, but the comment period was ultimately extended an additional month due to the COVID-19 pandemic, TRP_AR_10533. The Draft EA received more than 900 comment letters. TRP_AR_10611.

In August 2021, the Cedar Creek Fire broke out in the area originally proposed for portions of the TRP. TRP_AR_12594. The Federal Defendants spent the next few months reviewing data and discussing plans for how to modify the TRP post-Cedar Creek Fire. TRP_AR_10753–10956. The Federal Defendants never re-opened the TRP for public comment, instead relying on internal conversations and collaboration with and advice from the North Central Washington Forest Health Collaborative ("NCWFHC"). *See* Federal Defendant's Administrative Record Index, 2022 Twisp Restoration Project, at 15 ("Power point: TRP Post Cedar Fire. Likely created for briefing NCWFHC.").

The TRP as described in the Final EA is drastically changed from the project on which the public had the opportunity to comment. The project size dropped from 77,037 acres to 24,140 acres (over 37 square miles). TRP_AR_12593. Even though the Final EA removed over 50,000 acres from the TRP, the areas removed from the final version of the TRP are still subject to proposed future "restoration" under the planned, and aptly named, "Midnight" project. TRP_AR_11381–82. The reduced size of the final TRP allowed the Federal Defendants to drop treatments preserved in certain Inventoried Roadless Areas ("IRA") and Late Successional Reserve ("LSR") areas. TRP_AR_11349. The Federal Defendants also shaved ten years off the TRP, taking the implementation timeline from thirty down to twenty years. *Id.* Again, the Federal Defendants never reopened the comment period to allow public comment on what was now essentially a completely different project from the TRP described in the Draft EA.

The Final EA analyzed only two alternatives: the Proposed Action and No Action. TRP_AR_12615–16. The Final EA mentions eleven other alternatives that were "considered but dismissed from detailed consideration." TRP_AR_12610. These eleven other alternatives were purportedly eliminated from detailed review due to not meeting one or more of the TRP's project "needs." *E.g.*, TRP_AR_12611 (explaining that an alternative maximizing aquatic and wildlife restoration would not satisfy project needs 2–5). The five stated TRP needs are as follows: (1) hydrologic function and aquatic habitat; (2) vegetation composition and structure; (3) wildlife habitat; (4) access and wildfire hazard in the wildland urban interface; and (5) roads. TRP_AR_12601–04.

21,149 out of 24,140 acres of the final TRP are set for what the Final EA describes as "condition-based management." TRP_AR_12616. The condition-based management

approach does away with site-specific planned logging ("treatment") in favor of "responsiveness and flexibility between planning and implementation on a landscape that is subject to rapid environmental changes." *Id.*

## III.    PLAINTIFF'S PARTICIPATION IN THE NEPA PROCESS

NCCC participated in the public comment periods for each stage in the NEPA process. NCCC submitted comments during the initial scoping period. TRP_AR_07222–28. One of NCCC's members, Richard Bailey ("Bailey"), also attempted to submit comments during the scoping period, but they do not appear in the Administrative Record. *See* TRP_AR_10548 ("I submitted scoping comments for this project in December, 2019[.]"). NCCC's scoping comments addressed the short timeframe between the release of the initial TRP notice and the deadline for comments. TRP_AR_07222.

At this early stage, NCCC was already concerned that the Federal Defendants would try to authorize a project on the scale of the TRP without issuing a project-specific EIS. *Id.* NCCC proposed the Federal Defendants consider an alternative that would minimize human intervention in natural processes. *Id.* These comments raised the scientific debate over the efficacy of human intervention like logging and road construction on fire suppression efforts. TRP_AR_07222–23. NCCC's scoping comments raised a variety of questions including the need to address climate change, the need for site-specific vegetation planning to account for forest variance, the need for the TRP to back up its conclusions with science and data, and the need to analyze the effects of introducing heavy machinery throughout the project area. TRP_AR_07223–24.

After the release of the Draft EA, both NCCC as a group and Bailey personally submitted comments. TRP_AR_08849; TRP_AR_10548. One of NCCC's primary

objections in comments was the Draft EA's analysis of only two alternatives. TRP_AR_08849. NCCC commented that any "no action" alternative is never actually in serious consideration due to the Forest Service's obligations under various federal statutes. *Id.* NCCC also took issue with the "action" alternative (the proposed action) that provided a 30-year timeframe with little monitoring and no guaranty of mitigation implementation. *Id.*

As it did in its scoping comments, NCCC's Draft EA comments urged the Federal Defendants to consider the beneficial way natural processes could achieve the project's stated needs. *Id.* NCCC objected to the lack of analysis under either alternative for what the TRP area's inherent successionally processes would achieve without human intervention. *Id.* NCCC repeated the call for the Federal Defendants to use a full EIS to analyze the TRP's significant environmental effects. TRP_AR_08850. NCCC's Draft EA comments also raised the economic issues of the TRP, including the fact that no amount of commercial logging would produce sufficient funding to carry out the then-planned thirty-year project without allowing loggers to remove many of the largest diameter trees the TRP is allegedly designed to protect. TRP_AR_08850–51. Thus, NCCC proposed a shorter-term, site-specific, targeted alternative that provides for repeated planning and monitoring phases to adapt to changing conditions. TRP_AR_08851.

Bailey's Draft EA comments discussed the difficulty any lay person would have should they try understanding the Draft EA, which Bailey described as being full of technical and insider language. TRP_AR_10548–49. Bailey observed that the TRP would transform one of the most cherished recreational areas of the Pacific Northwest into a conglomerate of artificially managed and logged stands, complete with stumps, skid trails,

slash piles, and the other hallmarks of large-scale commercial logging. TRP_AR_10549. Bailey's comments focused on the recreational and ecological value of the project area, and he discussed the lack of analysis of the TRP's effects on recreation especially. *Id.* Bailey noted that all five of the TRP's stated "needs" were were cloaked justifications for extensive logging. *Id.* Bailey further noted the need for future TRP documents to provide the scientific background and support for any conclusions reached about project needs and the best means to accomplish them. *Id.*

Bailey's comments on the Draft EA also mentioned various problems with the road-related portions of the TRP. TRP_AR_10552–53. Bailey noted the TRP would increase ATV traffic and use in the area despite ATV use fitting none of the project's stated needs. TRP_AR_10552. Bailey's road comments were tied into his suggested alternative, which was the decommissioning of Road 4430 ("the west side Twisp River Road"). TRP_AR_10553.

Bailey's Draft EA comments also challenged the TRP's apparent assumption that logging as "fuel reduction" is a scientifically viable means of protecting the area from dangerous wildfires. *Id.* Per Bailey's comments, the Federal Defendants were misleading the public by suggesting that logging provides safety from wildfires generally, when in fact, logging and fuel suppression cannot prevent wildfires of severe intensity. *Id.* Bailey provided examples and insights from his own experience as a wildlands firefighter. *Id.* Importantly, Bailey commented that scientific evidence and support must be provided in the TRP documents to justify the Federal Defendants' conclusions about the efficacy on logging as a method for fire suppression. TRP_AR_10553–55.

After the Cedar Creek Fire, NCCC remained as engaged as possible with the NEPA process, *e.g.*, TRP_AR_11316, although the project was never reopened for post-fire public comment. After the Federal Defendants released the Final EA and FONSI, NCCC filed an objection. TRP_AR_12162–12253. NCCC's objection set out ten separate categories of NEPA violations in the Final EA and FONSI: (1) denying the public a reasonable opportunity to submit alternatives to the proposed action; (2) failing to analyze a reasonable range of alternatives and providing a faulty analysis of the no-action alternative; (3) failing to provide support for how the 20-year project would be funded; (4) failing to prepare a full EIS; (5) failing to disclose what "further action" the Federal Defendants would intend to take to maintain desired conditions; (6) failing to reopen the public comment period after the Cedar Creek Fire; (7) failing to analyze the cumulative effects of the TRP and unlawfully segmenting other known future projects from the cumulative effects analysis; (8) failing to provide the public access to information and opportunities to participate to the extent given to NCWFHC; (9) failing to justify the Final EA's conclusion that the Twisp River Watershed failed to meet the desired historical conditions or to otherwise provide scientific support for thinning as a desirable goal; and (10) using condition-based management to obscure the actual effects of the TRP from the public.

## IV.    PLAINTIFF'S STANDING TO CHALLENGE THE TRP

NCCC has standing to challenge the Federal Defendants' NEPA compliance related to the TRP. To establish standing as required by the Constitution, plaintiffs must demonstrate "(1) an injury in fact that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by

a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). In the context of NEPA, "procedural injuries frequently suffice for" Article 3 standing purposes if those procedures threaten one of the plaintiff's concrete interests. *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005). Thus, "plaintiffs who use the area threatened by a proposed action or who own land near the site of a proposed action have little difficulty establishing a concrete interest." *Id.* An organization like NCCC can assert standing on behalf of its members if: (1) the members would themselves have standing; (2) the interests the organization is trying to protect are "germane to the organization's purpose"; and (3) the organization is asserting claims and requesting relief that do not require individual participation by the organization's members. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

NCCC's mission focuses on the protection and preservation of the scientific, recreational, educational, and wilderness values of the North Cascades. Bailey Dec. at 2, ¶4. NCCC's members have deep, direct ties to the TRP project area. *See, e.g.*, *id.* at 3, ¶10 (describing Bailey's first visit to the area in 1960). Some of NCCC's members have spent literally their entire lives living in the TRP project area. Shaffer Dec. at 1–2, ¶3. NCCC's members frequently recreate in the TRP project area. *Id.* at 2, ¶5. Bailey, for example, has a camping trip planned for August 7, 2023. Bailey Dec. at 3–4, ¶12. The TRP will have a significant adverse effect on NCCC's members' environmental and aesthetic interests, *id.* at 4, ¶¶14–15, and it even poses a threat to the health of those members living in the TRP project area, *see* Shaffer Dec. at 2, ¶7 ("The impacts of ground-disturbing machinery for log skidding in the immediate vicinity of Poorman Creek has the potential to degrade water quality, which could have a direct impact on my health.").

Accordingly, NCCC's members have injuries in fact traceable to the TRP, and NCCC's requested relief (remanding the TRP back to the agency and enjoining the project from moving forward) will redress those injuries. NCCC's core purpose is to protect the North Cascades, including the TRP project area, from the kind of unscientific environmental degradation threatened by the TRP. None of NCCC's claims or the relief requested requires the individual participation of NCCC's members directly. Therefore, NCCC satisfies all the required criteria to assert organizational standing to challenge the TRP.

## V.    STANDARD OF REVIEW

NEPA claims are analyzed under the "arbitrary and capricious" standard of the APA. *350 Montana v. Haaland*, 50 F.4th 1254, 1263 (9th Cir. 2022). That now-familiar standard requires reversal of the agency action "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Under the APA, federal agencies are obligated to fully and fairly analyze the environmental impact of actions undertaken by those agencies. *350 Montana*, 50 F.4th at 1266. The agency must also publicize its analysis in order to allow the public to be fully informed as to federal agency decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). If the agency issues a FONSI, as it has here, the court must determine whether the federal agency "adequately considered and elaborated the possible consequences" before deciding the action would have no significant

environmental impact. *350 Montana*, 50 F.4th at 1266. The agency's decision not to prepare a full Environmental Impact Statement ("EIS") must be reasonable. *Id.* Ultimately, the court must determine whether the agency took a "hard look" at the environmental consequences of agency actions. *Id.* at 1265 (quoting *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762–63 (9th Cir. 2014)).

## VI.    ARGUMENT – THE TRP VIOLATES NEPA

### A.    The Final EA failed to analyze a reasonable range of alternatives and relied on an unreasonably narrow purpose and need statement.

The Federal Defendants violated NEPA by failing to analyze a reasonable range of alternatives. This analysis begins with the Project's purpose and need statement. *See Audubon Society of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022) ("The range of alternatives that an agency must consider under NEPA is based on the purpose and need of the proposed agency action."). Agencies do have flexibility and discretion drafting a purpose and need statement, but the purpose and need statement cannot "unreasonably narrow [] the agency's consideration of alternatives so that the outcome is preordained." *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 876 (9th Cir. 2022) (quoting *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084–85 (9th Cir. 2013)). Even if the purpose and need statement is narrow—but still within the range required by NEPA—agencies must still examine all viable alternatives in an EA. *See id.* at 877 ("The existence of a 'viable but unexamined alternative' renders the environmental review conducted under NEPA inadequate.") (quoting *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)). Put simply, if the agency fails to examine a viable alternative, the agency violates NEPA. *Id.*

The TRP offers a prime example of a NEPA process designed to produce a preordained outcome. As Bailey observed in his Draft EA comments, the TRP is essentially a massive commercial logging project. TRP_AR_10549. The only reason the TRP was reduced from 77,000 acres to 24,000 acres was the Cedar Creek Fire, and even then, the area removed from the TRP will still be logged at a future date as the "Midnight Restoration Project," which was already in the preliminary stages of planning before the Federal Defendants release the Final EA for the TRP. TRP_AR_12179.

Looking at the stated project needs, each is carefully drafted to allow the Federal Defendants to claim heavy and extensive logging ("thinning" or "treatment" or "prescriptions") as the only "viable" alternative. The first stated need, hydrologic function and aquatic habitat, is perhaps the best example. The third bullet point in the Final EA describing the purported need for this project mentions the "less diverse habitat and greater susceptibility to uncharacteristic effects from wildfires and insect and disease outbreaks" caused by previous fire suppression and logging activities. TRP_AR_12602. Notably, the Final EA does not explain how more "fire suppression" and logging activities will satisfy a project need that was also caused by fire suppression and logging activities. This kind of scientifically unsound, and circular logic demonstrates the Final EA's commitment to the preordained logging outcome.

Even within the TRP's stated needs, the reasons the Federal Defendants advanced for eliminating viable alternatives were arbitrary and capricious. One of the eliminated alternatives was using a narrower maximum tree diameter than the eventual 21" (24.9" for diseased trees) maximum.[3] TRP_AR_12611. The Final EA states this alternative was

---

[3] Under "conditions based management" prescriptions, the Forest Service does not mark trees to distinguish "diseased" versus healthy trees. The decision to cut larger "diseased" trees is left to the discretion of the

eliminated from analysis because it "would decrease stand diversity." *Id.* However, there is no indication in the Final EA how the Federal Defendants draw that conclusion. The TRP already uses condition-based management for roughly 87% of the TRP, which by definition means there is no site-specific plan for how 87% of the TRP's 24,000 acres will be logged. Thus, how can the Federal Defendants claim the 21" diameter maximum will lead to "more diverse" stand diversity, when the Final EA makes no attempt to specify what logging will occur under the proposed alternative? Likely, the Federal Defendants eliminated a narrower maximum trunk diameter because larger-diameter trees are more valuable to the commercial loggers who will fund—in part—the TRP, although there is no way to be certain. What is certain is the reasons advanced for eliminating the narrower-diameter alternative are illogical, arbitrary, and capricious.

The Final EA also eliminates the "natural succession" alternative without reasonable justification. The Final EA eliminates an alternative that would take advantage of the TRP project area's natural processes because the alternative is ostensibly "addressed in the 'No Action' alternative, which would provide for natural succession by taking no active management." TRP_AR_12612. This logic is based on a premise that is faulty even within the TRP's baseline presumptions. The Final EA explains that the TRP project area's "vegetation composition and structure" is currently significantly different from what the Final EA describes as the forest's "historical" state. TRP_AR_12602. A true natural succession alternative would establish the necessary steps to restore the forest to a natural state, which would involve removal of roads and likely lower levels of site-specific logging to undo the effects of past logging (though even that proposition is somewhat illogical).

_____

logging contractor and there is little, if any, means to qualitatively monitor the process or amount of logging across such a vast project area.

Thus, the no-action alternative is not a "natural succession" alternative at all, as the Final EA already admits, because the TRP project area is not fully in its natural state. The Final EA makes no attempt to explain or explore whether a true natural succession alternative would satisfy the project needs, and instead, simply tries to lump it in with the no-action alternative. The two alternatives are not identical, and the elimination of the natural succession alternative was arbitrary and capricious.

The Final EA also eliminates a "phased approach" for reasons that have nothing to do with the stated project needs. The phased-approach alternative would provide for five phases of planning and analysis that would inform the public and allow the public to participate in the planning process at each phase. This approach is in stark contract from the proposed action, which uses unspecified condition-based management on 21,000 acres of forest over a twenty-year period, *i.e.,* the public will have no idea what degree of logging will actually occur until it happens. The phased approach was eliminated because it would take too long. *See* TRP_AR_12614 ("[The phased approach would] roughly tripl[e] the time spent on analysis and implementation, defer[] implementation of treatments proposed in [the preferred alternative], and delay[] planning efforts for other restoration projects on the district."). However, the Final EA does not actually explain why the phased approach, which would allow more site specific analysis as required under NEPA, would take longer than the preferred alternative's twenty-year timeframe. Moreover, the preferred alternative already suffers from a lack of guaranteed funding moving forward over the TRP's twenty-year lifespan. Thus, there is no basis for the Federal Defendants to conclude that a phased approach would satisfy the project needs to any lesser extent than the preferred alternative. The Federal Defendants eliminated this alternative from closer analysis simply because

they did not want to expend the effort doing so, or have to engage in site-specific analysis, which is not a lawful reason to eliminate a viable alternative from consideration under NEPA.

The aforementioned alternatives are "viable but unexamined" alternatives that render the Final EA deficient under Ninth Circuit precedent. The Federal Defendants' reasons for eliminating these alternatives (or in the case of the natural success alternative, lumping it in with the no-action alternative) were not based on the TRP's stated needs. Instead, the Federal Defendants eliminated the alternatives out of convenience or the desire to make the TRP more attractive to commercial loggers. These are not legally defensible reasons to eliminate alternatives from consideration. Therefore, the Final EA's treatment of alternatives is arbitrary and capricious, and the TRP must be remanded back to the Forest Service for adequate development of viable alternatives.

**B.    The Final EA failed to fully disclose and analyze the direct, indirect, and cumulative impacts of the TRP.**

Due to the near-blanket use of "condition-based management," no one reading the Final EA, including the Federal Defendants, would be able to explain what the TRP's actual direct, indirect, or cumulative impacts might be. The Final EA's omission of information and analysis of the Midnight Restoration Project and any other future area projects also renders the cumulative impacts analysis deficient. The Ninth Circuit requires agencies using the NEPA process to analyze the cumulative impacts of agency actions in the context of past, present, and future projects. *Center for Community Action and Environmental Justice v. Federal Aviation Administration*, 61 F.4th 633, 644 (9th Cir. 2023). This is true even if the document prepared is an Environmental Assessment and not a full Environmental Impact Statement. *Id.* If agencies could satisfy NEPA without

analyzing cumulative impacts, NEPA would have a loophole allowing them to avoid conducting any kind of extensive, comprehensive environmental review simply by splitting up projects into smaller and smaller pieces. *Id.* Thus, the cumulative impact analysis requirement prevents federal agencies from ignoring "individually minor but collectively significant actions." *Id.* (citing *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 645–46 (9th Cir. 2004)).

Proving a failure to consider cumulative impacts is not "an onerous burden," and NEPA claimants have no obligation to provide evidence or even show what actual cumulative effects would occur. *Id.* at 645 (internal quotation marks omitted) (quoting *Tinian Women Ass'n v. U.S. Dep't of the Navy*, 976 F.3d 832, 828 (9th Cir. 2020)). Instead, claimants prevail if the agency failed to "provide some quantified or detailed information" about the cumulative impacts of a project. *Id.* at 644 (internal quotation marks omitted) (quoting *Bark v. United States Forest Service*, 958 F.3d 865, 872 (9th Cir. 2020)). The required "hard look" at cumulative impacts is an adequate explanation of the potential cumulative effects and risks; it is not about whether the NEPA claimants agree with the particular explanations, if any. *Id.*

In this case, the Final EA states, "[a]pproximately 21,149 acres of the [24,140-acre] project are under consideration for condition-based thinning and prescribed fire treatments." TRP_AR_12616. Thus, roughly 87% of the TRP will be conducted with condition-based management over the implementation timeframe of twenty years. What does that mean? No one can possibly know, because the point of condition-based management is to wait to specify what logging will occur only *after* the loggers reach the area to be logged. *See* TRP_AR_12616. The Final EA attempts to cover this glaring

deficiency by using "the maximum estimates of condition-based treatments to determine effects in their analyses for this project." *Id.*

NCCC agrees with the Federal Defendants' implied conclusion that commercial loggers will seek the maximum possible number of trees to log. However, there is no indication how the Federal Defendants determined the "maximum" logging that would occur in any given area. The idea behind condition-based management presumes site-specific conditions are unknown or unavailable to the extent that site-specific analysis is untenable (if it were not so, and that data were available, the Federal Defendants would be obligated to use that data to analyze the TRP's actual effects—though that is ultimately their obligation anyway, as this Motion argues).

If the TRP is proceeding on the presumption that site-specific data is unavailable for analysis, there is no possible way the Federal Defendants could determine what the "maximum" amount of logging is that would supposedly restore the forest to its "historical" state. *See Or. Nat. Desert Ass'n v. Jewell* ("*ONDA*"), 840 F.3d 562, 570–71 (9th Cir. 2016) ("NEPA procedures must insure that environmental information is available to public officials . . . *before* decisions are made and before actions are taken.") (emphasis added). The "maximum," therefore, is not a real maximum at all. The numbers are just arbitrary estimates the Final EA uses in an attempt to show some amount of impacts analysis, but the analysis is illusory. The Federal Defendants cannot analyze the direct, indirect, or cumulative impacts of logging over 21,000 acres of forest if there is no actual site-specific plan for what logging will occur. Even if less logging occurs than the "maximum" stated in the Final EA (for example, if there is no funding ten years into the twenty-year project), the Final EA fails to articulate the direct, indirect, or cumulative impacts of how that might

affect the forest and wildlife, recreation, and water quality that the forest sustains. The public certainly cannot draw any supported conclusions about what the TRP will actually entail, much less the actual outcome over the course of the 20-year project. The use of condition-based management is the antithesis of what NEPA requires under Ninth Circuit and Supreme Court precedent.

Significantly, the Final EA also fails to analyze the cumulative effects of the TRP in conjunction with the Midnight Restoration Project, a project that is reasonably certain to move forward, given that Federal Defendants are already in the initial planning stages. There is no reason why the Final EA could not consider the cumulative impacts of the Midnight Restoration Project and any other planned future projects, because the area of the Midnight Restoration Project *was originally part of the same TRP*. The Federal Defendants either omitted the analysis because it would take additional time to figure out the full scope of the fallout of the Cedar Creek Fire, or they realized that a 77,037 acre logging project is simply too massive to survive review under an EA as having no significant environmental impacts. Either way, the bifurcation of the original project does not relieve the Federal Defendants from their obligation to consider the cumulative effects of the TRP with the Midnight Restoration Project and any other reasonably certain future projects. This is exactly the kind of "smaller and smaller pieces" segmentation forbidden under NEPA by the Ninth Circuit in cases like *Center for Community Action and Environmental Justice*. Omitting cumulative effects analysis from, at least, the Midnight Restoration Project was arbitrary and capricious. Therefore, the court should grant NCCC's motion.

/////

/////

C.     **The NEPA process failed to allow meaningful public participation and failed to adequately inform the public about the TRP.**

One of NEPA's foundational, mandatory purposes is to encourage public participation in the decision making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–49 (1989). NEPA absolutely requires federal agencies to use and disclose to the public high-quality scientific information and accurate analyses. *ONDA*, 840 F.3d at 571. If there are critical changes or critical new information added to a project after the close of public comments, federal agencies must reopen the project for public comment. *Aina Nui Corp. v. Jewell*, 52 F.Supp.3d 1110, 1119 (D. Hawaii 2014). Otherwise, the agency could simply withhold crucial data or information about a given project until after the close of public participation. In this regard, the TRP violates NEPA in two ways. First, the Final EA violates NEPA by using indeterminate condition-based management on over 21,000 acres of forest. Second, the Federal Defendants should have reopened the TRP for further public comment after the Cedar Creek Fire and the Federal Defendants removal of over 50,000 acres from the project described in the Draft EA.

The previous section of this Motion explains why condition-based management cannot provide any factual basis for NEPA analysis. Again, there is no possible way that Federal Defendants or any member of the public reading the Final EA could know what logging will actually occur over the TRP's twenty-year timeframe. If the courts allow the Forest Service to circumvent the required site-specific data and analysis through condition-based management, it is difficult to see why federal agencies would ever provide site-specific information. It is far more efficient to blanket a project with condition-based management regime that requires no specific analysis of any kind. Further, the use of condition-based management is likely to produce significantly lower levels of public

participation, because the public will have no data or information on what projects actually entail, or how to monitor for success or failure. This is what NCCC means when it calls condition-based management the antithesis of what NEPA requires. *Supra*, at 17. Condition-based management provides neither public information nor meaningful opportunities for informed public participation. Therefore, the TRP's blanket use of condition-based management violates NEPA.

Using the public-participation and information lens of NEPA, it is difficult to understand why Federal Defendants failed to reopen the TRP for public comment after the Cedar Creek Fire. The TRP described in the Final EA is 50,000 acres smaller than the project described in the Draft EA. The portions of the project removed from the TRP are now subject to currently undisclosed future logging endeavors including the Midnight Restoration Project. Many important and controversial aspects of the proposed action in the Draft EA. However, much of the logging planned in the TRP remains intact under the Draft EA despite the drastically different scope and conditions of the project area. Now that 50,000 acres of the project are ostensibly removed (for now), it is not entirely clear whether the condition-based management approach for the remaining 21,000 applicable acres of the TRP would satisfy the project needs to the same extent as previously, to the extent that condition-based management can ever be fairly evaluated, which it cannot.

The massive change in the TRP from the Draft EA to the Final EA also affects the viability of alternatives, the analysis of which was already deficient before the Final EA. These changes represent the kind of critical new data that require the opportunity for public comment and participation. Further, the Final EA fails to disclose the existence of the Midnight Restoration Project and potentially other reasonably certain future area projects,

denying the public further opportunities to make informed comments and participate in the NEPA process in a meaningful way. Therefore, the Federal Defendants violated NEPA by issuing the Final EA and FONSI without reopening the project for public comment.

> **D.    The Federal Defendants violated NEPA by failing to prepare an Environmental Impact Statement.**

NEPA requires federal agencies to prepare an Environmental Impact Statement for major federal decisions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS is mandatory even if there are "substantial questions" whether a given project will have a significant effect on the human environment. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 868 (9th Cir. 2020) (citation omitted). Here, there is no question; the 24,000-acre version of the TRP will have a significant effect on the human environment.

Based solely on the scope of the TRP, even as reduced from the Draft EA, it is difficult to understand how the proposed action could be insignificant enough to permit a FONSI. The TRP project area is home to a multitude of Endangered Species Act listed species, like the Columbia River spring chinook. TRP_AR_12651. The proposed action also includes at least 35.6 miles of open roadways to implement the TRP. TRP_AR_12672. Perhaps most importantly, the proposed action subjects over 32 square miles of wildland to unspecified condition-based management, *i.e.,* logging with virtually no oversight.

The use of condition-based management guarantees the kinds of "substantial questions" that necessitate preparation of a full EIS. Indeed, as is described above, there are "substantial questions" about what condition-based management will actually entail, what levels of logging will actually occur, how the Federal Defendants can determine a "maximum" level of logging without site-specific prescriptions. Although the TRP was reduced from 77,000 acres to the current 24,140-acre size, 21,000 acres of unspecific

wildland logging could certainly constitute a significant effect on the environment. In fact, Defendants' stated purpose of the TRP relies, in part, on the proposed action having a significant effect, but they nevertheless issued a FONSI.

Specifically, as stated in the Final EA, the TRP under the proposed action is expressly intended "to protect life and personal property" from intense wildfire on the wildland-urban interface. TRP_AR_12603. The court should accordingly ask, if the TRP will have no significant impact on the *human* environment, how can the Federal Defendants possibly justify the proposed action as the only viable action alternative to protect life and personal property? At face value, the Final EA and FONSI together proclaim that 32 square miles of unspecific logging represents the only viable action alternative to protect life and personal property, but logging the 32 square miles will have no significant effect on the human environment. These conclusions cannot be reconciled. The illogic of the Federal Defendants' position on issuing the FONSI underscores the arbitrary and capricious nature of the TRP NEPA process. Either the proposed action will have a significant effect on the human environment, or it will fail to satisfy the project's stated need to protect life and property. Therefore, it is necessary to remand the TRP back to the Federal Defendants to prepare a complete EIS, and the court should grant NCCC's Motion for this reason as well.

/////

/////

/////

/////

/////

/////

## VII.    CONCLUSION

For the foregoing reasons, the Federal Defendants failed to satisfy their obligations under NEPA and the APA. Therefore, the court should grant NCCC's Motion for Summary Judgment, vacate the FONSI, remand the TRP back to the Forest Service, and enjoin the TRP from moving forward until the Federal Defendants fully comply with the law.

DATED this 7th day of July, 2023.

HUTCHINSON COX

By:

William H. Sherlock, OSB #903816
Of Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on <u>July 7, 2023</u>, I served or caused to be served a true and complete copy of the foregoing **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

- ☒ Via CM / ECF Filing
- ☐ Via First Class Mail, Postage Prepaid
- ☐ Via Email
- ☐ Via Personal Delivery

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

SHAUN M. PETTIGREW (CA State Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
shaun.pettigrew@usdoj.gov

*Attorneys for Federal Defendants*

HUTCHINSON COX

By: _____
William H. Sherlock, OSB #903816
Of Attorneys for Plaintiff