TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

SHAUN M. PETTIGREW (CA State Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(206) 526-6881
shaun.pettigrew@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NORTH CASCADES CONSERVATION COUNCIL, a nonprofit Washington corporation;<br><br>   *Plaintiff,*<br><br>   v.<br><br>U.S. FOREST SERVICE, a federal agency of the United States; and KRISTIN BAIL, in her official capacity as Forest Supervisor, Okanogan-Wenatchee National Forest, U.S. Forest Service,<br><br>   *Defendants,* | Case No. 2:22-cv-00293-SAB<br><br>**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT OF CROSS-MOTION, AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 15)**<br><br>**11/30/2023**<br>**With Oral Argument: 10:00 a.m. Video** |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

I.    BACKGROUND...........................................................................2

    A.    Factual Background ..........................................................2

        1.    Management of the Okanogan-Wenatchee National Forest ..................................................................2

        2.    Okanogan-Wenatchee National Forest Restoration Strategy and Twisp Landscape Evaluation.....................3

        3.    Twisp Restoration Project ..........................................5

            a.    Project Initiation and Scoping...............................5

            b.    Draft EA ...........................................................7

            c.    Final EA and DN/FONSI .....................................9

        4.    Procedural History ...........................................12

    B.    Legal Background .........................................................12

        1.    National Environmental Policy Act...........................12

        2.    Administrative Procedure Act .................................13

II.    ARGUMENT ..............................................................................13

    A.    The Stated Purpose and Need for the Project was Not Unreasonably Narrow and the Final EA Considered a Reasonable Range of Alternatives ......................................13

        1.    Purpose and Need Statement ...........................14

        2.    Reasonable Range of Alternatives................................15

    B.    The Final EA Took a Hard Look at the Project's Potential Impacts ...............................................................20

        1.    Condition-based Management ......................................21

2.    Potential Midnight Restoration Project .........................27

C.    The Forest Service Satisfied NEPA's Public Participation
      Requirements ............................................................29

D.    The FONSI was not Arbitrary or Capricious...........................31

CONCLUSION ........................................................................35

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013)..................................................................17

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995)......................................................................15

*All. for the Wild Rockies v. Pena*,
  865 F.3d 1211 (9th Cir. 2017)..................................................................32

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004)....................................................................31

*Audubon Soc'y of Portland v. Haaland*,
  40 F.4th 967 (9th Cir. 2022).............................................................. 17, 18

*Bark v. Northrop*,
  607 F. App'x 652 (9th Cir. 2015)...................................................... 18, 31

*Bark v. United States Forest Service*,
  958 F.3d 865 (9th Cir. 2020)....................................................................35

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008)....................................................................30

*Blue Mountains Biodiversity Proj. v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998)..................................................................31

*Blue Mountains Biodiversity Proj. v. Trulock*,
  No. 2:21-cv-01033-HL, 2023 WL 3645966 (D. Or. April 27, 2023) .................32

*Cal. Trout v. FERC*,
  572 F.3d 1003 (9th Cir. 2009)..................................................................31

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997)..................................................................14

*Conservation Cong. v. United States Forest Serv.*,
  No. 2:16-cv-00864-MCE, 2018 WL 2427640 (E.D. Cal. May 30, 2018) .... 32, 34

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008)..................................................................35

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ................................................................14

*Earth Island Inst. v. United States Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ................................................... 16, 18

*Env't Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ................................................................14

*Env't Prot. Info. Ctr. v. United States Forest Serv.*,
    451 F.3d 1005 (9th Cir. 2006) ................................... 13, 27, 28, 33

*Friends of Southeast's Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998) ..............................................................15

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
    844 F.3d 1095 (9th Cir. 2016) ..............................................................25

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
    545 F.3d 1147 (9th Cir. 2008) ..............................................................16

*Idaho Conservation League v. Bonneville Power Admin.*,
    667 F. App'x 214 (9th Cir. 2016) .........................................................16

*In Def. of Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ..............................................................31

*Karuk Tribe of Cal. v. United States Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ..............................................................13

*Kettle Range Conservation Group v. United States Forest Serv.*,
    148 F. Supp. 2d 1107 (E.D. Wash. 2001) ..........................................15

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................13

*League of Wilderness Defs./Blue Mts. Biodiversity Proj. v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ................................................................29

*McFarland v. Kempthorne*,
    545 F.3d 1106 (9th Cir. 2008) ..............................................................13

*Muckleshoot Indian Tribe v. United States Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ................................................................15

*N. Cascades Conservation Council v. United States Forest Serv.*,
    No. 2:20-cv-01321-DGE, 2022 WL 1043930 (W.D. Wash. April 7, 2022) ........19

*N. Cascades Conservation Council v. United States Forest Serv.*,
  No. 2:20-cv-01321-RAJ-BAT, 2021 WL 8344155 (W.D. Wash. May 28, 2021)
  ..............................................................................................................19

*Native Ecosystems Council v. United States Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005).................................... 15, 16, 18, 32, 33

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012)...................................................................17

*Neighbors of Cuddy Mountain v. Alexander*,
  303 F.3d 1059 (9th Cir. 2002)............................................... 27, 28

*Neighbors of Cuddy Mountain v. United States Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998)...................................................................21

*Northwestern Ecosystems Alliance v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007)...................................................................13

*Ocean Advoc. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005).....................................................................31

*Or. Nat. Desert Ass'n v. Jewell*,
  840 F.3d 562 (9th Cir. 2016).....................................................................25

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010)...................................................................13

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...................................................................................12

*San Luis Obispo Mothers for Peace v. NRC*,
  449 F.3d 1016 (9th Cir. 2006)...................................................................35

*Southeast Alaska Conservation Council v. U.S. Forest Service*,
  443 F. Supp. 3d 995 (D. Alaska 2020)........................................ 25, 26

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ..................................................................29

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012)...................................................................21

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004)........................................................ 12, 14

*Wild Wilderness v. Allen*,
  871 F.3d 719 (9th Cir. 2017).....................................................................31

*WildEarth Guardians v. Conner*,
    920 F.3d 1245 (10th Cir. 2019) ...................................................................23

**Statutes**

42 U.S.C. § 4321 .............................................................................................12

42 U.S.C. § 4331 .............................................................................................12

42 U.S.C. § 4332(2)(C) ...................................................................................12

5 U.S.C. § 706(2)(A) .......................................................................................13

5 U.S.C. §§ 701-706 ........................................................................................13

**Regulations**

40 C.F.R. § 1501.1 ..........................................................................................12

40 C.F.R. § 1501.5(a) ......................................................................................12

40 C.F.R. § 1501.6(a) ......................................................................................13

40 C.F.R. § 1502.14 .........................................................................................20

40 C.F.R. § 1508.27(b) (2005) ........................................................................31

## INTRODUCTION

Like other national forests throughout the West, past management of the Okanogan-Wenatchee National Forest (Forest) in north central Washington has resulted in unnatural forest stands that are overstocked and homogeneous in structure and composition. This leads to a less resilient forest that is subject to high intensity wildfires, insect infestations, and disease outbreaks. Over a decade ago, the Forest Service developed a restoration strategy to improve the resiliency of the Forest. In furtherance of this strategy, the Forest Service conducted a landscape-level assessment of conditions on areas of the Forest near Twisp, Washington, documenting how current conditions depart from desired historic and future reference conditions. That assessment recommended that the Forest Service develop projects to begin to restore the forest and improve its resiliency by bringing it closer to the desired conditions. Toward that end, after more than three years of planning, public participation, environmental analysis, and consultation with tribes and other government agencies, the Forest Service approved the Twisp Restoration Project (Project) in July 2022.

The Project will improve forest resiliency in the Project area by, among other things, authorizing non-commercial understory thinning, commercial overstory vegetation treatments, and prescribed fire to reduce fuels. And it will accomplish this largely through the application of condition-based management by which pre-identified units in the Project area that meet certain decision criteria will be treated according to detailed prescriptions. In developing the Project, the Forest Service received extensive public comments during scoping and in response to a draft environmental assessment (EA). It then sought and received further public input following a wildfire in the Project area in 2021 before issuing a final EA and approving the project.

All of this satisfied the Forest Service's obligations under the National

Environmental Policy Act (NEPA). Nevertheless, Plaintiff brought this action claiming that the Forest Service violated NEPA by failing to consider a reasonable range of alternatives, take a hard look at the potential environmental consequences of the Project, sufficiently engage the public, and prepare an environmental impact statement (EIS). None of Plaintiff's claims is well founded and the Court should enter summary judgment for Defendants.

## I.    BACKGROUND

### A. Factual Background

#### 1.  Management of the Okanogan-Wenatchee National Forest

The Forest Service manages the part of the Forest encompassing the Project under a 1989 land and resources management plan (Forest Plan) that identifies various forest management goals and objectives, forest-wide standards and guidelines, and management area prescriptions. AR01561-671 (record of decision approving Forest Plan); AR01716-824 (Forest Plan management direction). This includes standards and guidelines for managing mixed conifer old growth stands. AR01748-49; AR00620 (defining mixed conifer old growth). The Forest Service implements the Forest Plan through site-specific projects like the Project. AR01679 ("Specific activities and projects will be planned and implemented to carry out the direction in this Forest Plan.").

The Forest is in the range of the northern-spotted owl (NSO). *See* AR03963. After the NSO was listed as a threatened species under the Endangered Species Act (ESA), the Forest Service adopted the Northwest Forest Plan (NWFP) in 1994 to amend forest plans within the NSO's range to include standards and guidelines for the management of habitat for late-successional and old-growth forest related species within the range of the NSO. AR03946-4181 (ROD approving NWFP). The NWFP provides for ecosystem management in a way "that will both maintain the late-successional and old-growth forest ecosystem and provide a predictable

and sustainable supply of timber, recreational opportunities, and other resources at the highest level possible." AR03979. The NWFP does this by allocating land to various areas that are to be managed for specified purposes according to detailed standards and guidelines. AR03955.

These land-use allocations include late successional reserves (LSR), riparian reserves, and matrix lands. AR03957-61. LSRs are intended to "maintain a functional, interactive, late-successional and old-growth forest ecosystem" that will "serve as habitat for late-successional and old-growth related species including the [NSO]." AR03957. "Riparian reserves are areas along all streams, wetlands, ponds, lakes, and unstable or potentially unstable areas where the conservation of aquatic and riparian-dependent terrestrial resources receives primary emphasis." AR03958. Their main purpose "is to protect the health of the aquatic system and its dependent species." *Id.* Matrix lands are lands outside the reserves and the other land-use allocations "in which most timber harvest and other silvicultural activities will be conducted." *Id.*

### 2. Okanogan-Wenatchee National Forest Restoration Strategy and Twisp Landscape Evaluation

In November 2012, the Forest Service finalized a document titled "The Okanogan-Wenatchee National Forest Restoration Strategy: adaptive ecosystem management to restore landscape resiliency" (Restoration Strategy). AR05890-6008. The Restoration Strategy identified the need for a concerted effort "to restore the sustainability and resiliency of forested ecosystems on the [Forest]," in light of documented "(1) increased susceptibility to uncharacteristically large and severe fires; (2) uncharacteristically severe insect outbreaks; and (3) habitats . . . declining for late-successional and old forest associated species." AR05895. The Restoration Strategy also explained that "while the Forest's aging road network provides needed access for recreation and forest management, it also degrades the condition of aquatic ecosystems." *Id.* To improve forest resilience and aquatic

ecosystems on the Forest, the Restoration Strategy promoted a "planning approach based on principles of landscape-level restoration ecology," *id.*, in which "ecological outcomes for multiple resources drive the development and implementation of projects," AR05897.

Implementation of this ecosystem management approach involves first preparing a landscape evaluation and then developing projects for restoration treatments based on that evaluation. AR05923. The landscape evaluation looks at five ecological indicators that "are meaningful at the landscape scale," and for which "[r]eference conditions have been established for both the historical range of variability and the future range of variability, representing a likely climate change scenario." *Id.* These five indicators are: "(1) forest landscape pattern and departure; (2) risk of insect infestation; (3) stand-level fuels and fire movement potential; (4) wildlife habitat amount and arrangement; and (5) aquatic/road interactions and road network evaluation." *Id.* The landscape evaluation process prioritizes areas "where restoration should occur in order to affect larger landscape change" by identifying potential landscape treatment areas (PLTAs). AR05924; *see also* AR05924-26 (summary of landscape evaluation process); AR05929-45 (details of process). Projects are then to be developed in the PLTAs that will contribute to restoring the sustainability and resiliency of forest ecosystems on the Forest. AR05945-48.

In April 2019, the Forest completed the Twisp Landscape Evaluation (Twisp Evaluation), covering six watersheds in the greater Methow Valley in Okanogan County, Washington: Upper Twisp River, Middle Twisp River, Little Bridge Creek, Lower Twisp River, Thompson Creek, and Alder Creek. AR06844; AR06846 (map). The Twisp Evaluation explained that previous management to suppress wildfires, promote grazing, intensively harvest timber, and build roads related to these activities "has caused widespread degradation of forest, rangeland,

watershed condition and stream habitat, and has increased the risks of uncharacteristically severe wildfire." AR06844.  This has resulted in an "urgent need" for ecological restoration projects on the Forest as illustrated by eastern Washington experiencing "some of its worst fire seasons on record" the last few years. *Id.*  To aid in the development of such projects, the Twisp Evaluation examined the ecological conditions of the six watersheds, comparing current conditions with reference conditions (i.e., historic and future ranges of variability) to "identify significant areas of departure." AR06846; *see also* AR06847-50 (detailing terrestrial and aquatic evaluation methods).

Having quantified such areas of departure in the terrestrial and aquatic environment, which reflect "a less resilient environment," the Twisp Evaluation found "several opportunities for restoration." AR06882.  For the terrestrial environment, underburning could "be used to thin out the smaller ladder fuels and reduce the risk of spreading crown fire, whereas thinning can open up space for the growing of larger trees which are more resilient and provide better structure for wildlife." *Id.*  And for the aquatic environment, road-related impacts could "be addressed by implementing road specific restoration methods," such as "decommissioning, relocating all or portions of the road, hydrologically closing roads, and upgrading existing roads." AR06883.

### 3.  Twisp Restoration Project
#### a.  Project Initiation and Scoping

Consistent with the Restoration Strategy, the Forest established a fourteen-member interdisciplinary team (IDT) in June 2019 to develop a restoration project in a 79,682-acre area of the Methow Valley Ranger District covered by the Twisp Evaluation. AR06905-08.  The project would move the landscape toward more resilient desired future conditions by: (1) changing the vegetation composition, structure, and pattern to intersect with the historic and future ranges of variability

as defined in the Restoration Strategy and other sources; (2) reducing the potential for high intensity wildfire in the wildland urban interface (WUI); and (3) designing and maintaining forest infrastructure, including roads, to reduce water quality impacts and maintain healthy, functioning watersheds that provide high quality water, air, and fishery habitat.  AR06906.

In November 2019, a scoping letter was sent to 362 individuals, groups, and agencies detailing the proposed project developed by the IDT, scheduling a public open house, and inviting comments on the proposal.  AR07003-05; AR07398.  As displayed in the below map, the proposed project was in a 77,038-acre area "southwest, west and northwest of Twisp, Washington in the Twisp River, Alder Creek, Rader Creek, and Wolf Creek drainages."  AR07003.



AR07015.

In developing the proposed action, the IDT had applied the Restoration Strategy to "identify areas where the current conditions have departed from desired

conditions." AR07006. This process identified five needs to be addressed based on conditions specific to the project area: (1) protection and maintenance of high-functioning aquatic, riparian, and hydrologic resources for species listed under the ESA and increased resiliency of watersheds to existing and anticipated disturbances; (2) modification of vegetation structure, composition, and patterns to improve resiliency to disturbances and bring vegetation within historic and future ranges of variability; (3) creation and maintenance of wildlife habitat, including late and old forest structure stands; (4) modification of forest stands in and next to the WUI to reduce fire intensity and enable direct firefighting strategies to protect life and personal property, and reduction of fire intensity in certain areas outside the WUI to aid fire suppression efforts; and (5) provision of an affordable, safe, and efficient transportation system. AR07006-09.

The proposed project would address the first and fifth needs through various actions, including closing or decommissioning roads, replacing culverts, reestablishing aquatic connectivity, introducing coarse woody debris and engineered log jams to aquatic habitat, thinning of tree stands, prescribed fire treatments, and removal of hazard trees. AR07010. It would address the remaining needs through additional actions, including commercial and noncommercial thinning and prescribed fire treatments. AR07010-11. As explained in the scoping letter, most of the thinning and prescribed fire treatments would use "a condition-based management strategy," which involves developing a suite of proposed treatments based on "pre-identified management requirements and specific resource conditions across a broad area," and applying "the most appropriate treatments to move resources toward the desired conditions" based on pre-implementation field reviews. AR07009.

### b. Draft EA

After receiving and considering responses to the scoping letter from 55

individuals, organizations, businesses, and local governments, the Forest Service issued a Draft EA in October 2020.  AR07383-625; AR07396 (noting number of responses).  The Draft EA considered a no-action and proposed action alternatives, analyzing the potential environmental effects of each.  AR07403-504.  The Draft EA also considered various other alternatives but eliminated them from detailed study because they would not meet the needs for the project.  AR07403-04.

Although the needs for the project remained the same in the scoping letter and Draft EA, AR07392-96, the Forest Service changed the proposed action in the Draft EA in response to issues raised in the public comments, AR07405-06.  The Draft EA's proposed action provided for understory vegetation thinning on up to 30,220 acres and overstory vegetation treatments on at most 21,985 acres.  AR07408-09 (Table 4).  The overstory vegetation treatments would use condition-based management to thin up to 10,840 acres of matrix lands, with the remainder being site specific treatments on matrix lands, LSRs, riparian reserves, and inventoried roadless areas.  *Id.*  The overstory thinning in matrix lands would allow removal of trees up to thirty inches in diameter.  AR07517-18.  Fuel reduction through piling, pile burning, and underburning would occur on at most 59,093 acres, requiring the construction of 204.5 miles of fire line.  AR07409.  The proposed action would also include wildlife and aquatic habitat enhancement measures, and would provide for certain trail and transportation management activities.  AR07409-10.

Release of the Draft EA triggered a comment period that closed on December 28, 2020.  AR07626-27; AR10533.  Between the release of the Draft EA and closure of the comment period, the Forest Service hosted a virtual open house and facilitated a self-guided tour of the project area (in light of then-applicable COVID-19 restrictions).  AR10465-68.  The Forest Service ultimately received 1,029 comments on the Draft EA.  AR12606; AR07628-10425.

### c. Final EA and DN/FONSI

Shortly before completion of the Final EA, "the Cedar Creek Fire burned into the northern portion of the project area in August 2021, causing mild to severe fire effects in the Wolf, Rader, and Little Bridge Creek drainages." AR12594. Fire suppression activities also involved fire line construction and fuel break thinning "in portions of the Little Bridge Creek and middle/upper Twisp River drainages." *Id.*

In response to the Cedar Creek Fire and comments received to the Draft EA, the Forest Service revised the proposed action to omit areas potentially affected by the Fire, explaining those revisions in a public meeting in January 2022. AR11349; AR11295-310; AR12029. A representative of Plaintiff attended that meeting and later expressed to the Forest Service that the "brevity and clarity" of the information presented "was impressive." AR11316. The Forest Service provided a public link to the meeting and materials used, summarized the major changes to the proposed action, and provided an update on the status of the Final EA. AR11349.

The Forest Service released the Final EA in April 2022, highlighting the key differences between the proposed action in the Draft EA and Final EA. AR12594-97. The revised proposed action reduced the project area to 24,140 acres. AR12593. Among other changes, this resulted in "dropping proposed thinning and prescribed fire actions and most transportation-related changes in the Wolf, Rader, and Little Bridge Creeks and upper and middle Twisp River sub-watersheds." AR12594. The below map identifies the original project area, the Cedar Creek Fire footprint, and the revised project area:



AR12596.

The Final EA's proposed action provided for non-commercial understory vegetation thinning on up to 13,812 acres and commercial overstory vegetation treatments on up to 8,151 acres. AR12618 (Table 6). No overstory treatments would occur in LSRs, with condition-based thinning on up to 7,275 acres of matrix lands and site-specific treatments for the remainder on matrix lands and in riparian reserves. *Id.* The diameter cap on overstory thinning on matrix lands was reduced from thirty inches ("large" trees) to twenty-one inches ("medium" trees). AR12724; AR12721 (defining "medium" and "large" trees). Fuel reduction through piling, pile burning, and underburning would occur on at most 23,167 acres, with 102.6 miles of associated fire line construction. AR12618. The proposed action would address transportation management by removing hazard and danger trees, replacing culverts, and road construction, maintenance, and closures. AR12625-26. And although there would still be some aquatic habitat enhancement measures, AR12619, most of that work became a separate project, the Twisp

Aquatic Restoration Project, implementation of which was expected to begin soon after April 2022.  AR12595.

The Forest Service released a draft Decision Notice and Finding of No Significant Impact (DN/FONSI) concurrently with the Final EA.  AR12099-127. Under Forest Service regulations, this triggered a 45-day period during which individuals and organizations who previously commented on the scoping letter or Draft EA could object to the Final EA or draft DN/FONSI.  AR12090 (citing 36 C.F.R. pt. 218).  The scope of those objections could include "new information that arose after the opportunities for comment."  *Id.*  The Forest Service received several objections, including objections from Plaintiff.  *See* AR12162-253.  Those objections were discussed with the Acting Deputy Regional Forester on July 12, 2022, and written responses to those objections were provided two weeks later. AR12282-84; AR12451-85; AR12498-506.

In the meantime, the Forest Service had also completed its consultation requirements under the ESA with the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (FWS).  AR12404-44 (FWS); AR12130-36 (NMFS).  NMFS concurred with the Forest Service's determination that the proposed action may affect but would not likely adversely affect two ESA-listed aquatic species, finding that the potential effects on those species were insignificant.  AR12134.  Similarly, FWS concurred with the Forest Service's determination that the proposed action may affect but would not likely adversely affect five aquatic and terrestrial species, including the NSO.  AR12441.

The Forest Supervisor adopted the proposed action in the Final EA as the Twisp Restoration Project in a final DN/FONSI dated July 20, 2022.  AR12830-66.  In doing so, the FONSI examined the context and intensity of the Project, concluding that an EIS was not required because it would not "have a significant effect on the quality of the human environment."  AR12843.

### 4.  Procedural History

Plaintiff brought this action challenging the Project in November 2022, asserting one claim under NEPA and another under the Federal Advisory Committee Act (FACA).  Compl. ¶¶ 19-36, ECF No. 1.  Consistent with the case schedule, Plaintiff moved for summary judgment on July 7, 2023.  ECF No. 14.  In that motion, Plaintiff waived its FACA claim, leaving only Plaintiff's NEPA claim at issue.  Pl.'s Mot. for Summ. J. (Pl.'s Br.) 1 n.1, ECF No. 15.

## B.  Legal Background

### 1.  National Environmental Policy Act

NEPA ensures that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment.  42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1.  NEPA serves the twin aims of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to members of the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA itself "does not mandate particular results, but simply prescribes the necessary process."  *Id*. at 350.  As a result, a "court must avoid passing judgment on the substance of an agency's decision.  Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions."  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).

NEPA requires the preparation of an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An agency may prepare an EA "for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown."  40 C.F.R. § 1501.5(a).  An EA is "a concise public document prepared by a Federal agency to aid an agency's compliance with [NEPA] and support its determination of whether to prepare an [EIS] or a finding

of no significant impact [(FONSI)]." *Id.* § 1508.1(h).  If an agency concludes the proposed action has no significant effect, "it may issue a FONSI in lieu of preparing an EIS." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 40 C.F.R. § 1501.6(a).

### 2.  Administrative Procedure Act

Agency decisions under NEPA are reviewed under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).  Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with that standard, an agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citation omitted).  The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam).

## II.  ARGUMENT

### A. The Stated Purpose and Need for the Project was Not Unreasonably Narrow and the Final EA Considered a Reasonable Range of Alternatives.

Plaintiff argues that the Forest Service violated NEPA by too narrowly

defining the purpose and need for the Project and by failing to consider a reasonable range of alternatives.  Neither fact nor law supports Plaintiff's arguments.

### 1.  Purpose and Need Statement

"NEPA requires federal agencies to 'study, develop, and describe appropriate alternatives to recommended courses of action.'" *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (quotation omitted).  "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms."  *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Agencies, however, have "considerable discretion to define the purpose and need of a project," *Westlands Water Dist.*, 376 F.3d at 866 (citation omitted), and a statement of purpose and need is unreasonably narrow only if it preordains the agency's consideration of specific alternatives, *Env't Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022).

The Forest Service reasonably defined the purpose and need of the Project. From scoping through the Final EA, the Forest Service identified five needs that a project would address.  These included protecting and maintaining aquatic resources and improving watershed resiliency, remedying past forest management by moving the forest toward a more resilient condition consistent with historic and future ranges of variability, enhancing wildlife habitat, reducing fire intensity while creating conditions to safely manage wildfire in the WUI, and managing the transportation system in an affordable, safe, and efficient manner.  AR12600-04. None of these five needs, collectively or individually, preordained a specific project or required what Plaintiff mischaracterizes as "heavy and extensive logging."[1]  Pl.'s

---

[1] Commercial treatments will occur in about one-third of the Project area and will consist almost entirely of thinning instead of more intensive harvest methods.

Br. 13.

Unsurprisingly, Plaintiff cites no cases that would support invalidating the Forest Service's statement of purpose and need. And that's because courts regularly uphold much narrower statements. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir. 1999) (upholding purpose and need statement to "consolidate ownership and enhance future resource conservation and management by exchanging parcels of National Forest System and Weyerhauser land."). Indeed, courts have routinely rejected arguments like Plaintiff's. *See Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) (upholding purpose and need statement for vegetation management and timber production project); *Kettle Range Conserv. Group v. U.S. Forest Serv.*, 148 F. Supp. 2d 1107, 1117-18 (E.D. Wash. 2001) (finding purpose and need statement that included commercial timber harvest not unreasonably narrow). The Forest Service's statement of purpose and need was reasonable and does not support a NEPA violation.

### 2. Reasonable Range of Alternatives

The range of alternatives an agency must consider is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (citations omitted). "Alternatives that do not advance the purpose of [a project] will not be considered reasonable or appropriate." *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005).

Importantly, "an agency's obligation to consider alternatives under an EA is

---

AR12618 (Table 6), AR12621-23 (overstory treatments). The understory thinning and fuel reduction treatments remove only small vegetation that does not have commercial value. AR12621 (limiting understory thinning to conifers of less the ten inches in diameter); AR12623-24 (fuel reduction treatments).

a lesser one than under an EIS." *Id.* at 1246 This is because "whereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citation omitted). An EA must consider a "no action" alternative and a "preferred alternative." *See Native Ecosys. Council*, 428 F.3d at 1245-46. But beyond that, there is no "numerical floor on alternatives to be considered," *id.* at 1246, and consideration of only these two alternatives is "generally sufficient," *Idaho Conserv. League v. Bonneville Power Admin.*, 667 F. App'x 214, 215 (9th Cir. 2016); *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021-22 (9th Cir. 2012) (noting EA's consideration of "both a no-action and preferred action alternative" generally sufficient). Indeed, "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." *Earth Island Inst.* 697 F.3d at 1023 (citation omitted).

The Final EA considered in detail a no-action alternative and a proposed action alternative. AR12615-33. It also identified several alternatives that "were considered but dismissed from detailed consideration" for various reasons. AR12610-15. This consideration of alternatives and explanations for why other alternatives were not considered satisfied NEPA. Plaintiff nevertheless claims that the Final EA's explanations for not considering three of the proposed alternatives in detail were arbitrary or capricious. Pl.'s Br. 13-16. They were not.

First, the Final EA explains that alternatives employing smaller diameter caps than the 21 inches contemplated by the Project "were not developed further because using these upper diameter limits would decrease stand diversity (age,

structure, and habitat), facilitating movement towards more even-aged stands over time which departs further from the historical and future ranges of variability desired in treated acres." AR12611. This would in turn "limit development of desired late-successional habitat and continue to increase density-induced mortality and elevate risks of disturbances (fire, insect & disease), impacting wildlife habitat (Need #3) and wildfire hazards in the [WUI] (Need #4)." *Id.* In other words, this proposed alternative would be counterproductive to the Project's purpose and need.

These explanations were based on the Forest Service's "scientific judgment and are entitled to deference." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 983 (9th Cir. 2022) (citing *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013); *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012)). Rather than point to contrary evidence, Plaintiff speculates that the condition-based management approved for much of the Project might not have its intended effect and that the Forest Service "[l]ikely" rejected a smaller diameter cap to placate "loggers." Pl.'s Br. 14. Not only does such speculation find no support in the record that would somehow diminish the deference owed to the Forest Service's scientific judgment, it misunderstands the Project's condition-based management as explained in section II.B.1 below.

In short, the Forest Service identified specific units in the Project area that it anticipates will benefit from understory thinning, overstory treatments, or fuel reduction treatments. If those stands meet the relevant decision criteria, they will be treated consistent with the prescriptions detailed in the Final EA. *See* AR12616-17. Forest Service experts determined that "[t]hese treatments would shift stand structures from a homogenous young forest multi-story to a diversified structure pattern across the landscape. Treatments would reduce stocking and improve tree vigor by increasing the growing space for the residual stand, therefore improving the overall health of the stand." AR12533. In other words, the Forest Service

explained precisely how the treatments applicable to the condition-based management would have their intended effect while a reduced diameter cap would have the opposite effect. This explanation is subject to deference and was not arbitrary or capricious. *See Audubon Soc'y of Portland*, 40 F.4th at 991 ("Ultimately, FWS concluded that continued grazing would 'help achieve its wildlife and habitat objectives,' while reduced grazing would 'have the opposite overall effect.' It is not our role to question that informed scientific judgment."); *see also Native Ecosys. Council*, 428 F.3d at 1248 ("The availability of commercial timber is simply a collateral benefit to the government and does not change the purpose or scope of the project. Native Ecosystems has not persuaded us that the Forest Service ignored a reasonable alternative."); *Earth Island Inst.*, 697 F.3d at 1023 (no duty for Forest Service to consider alternatives that would increase fire risk where purpose of project is to reduce fire risk); *Bark v. Northrop*, 607 F. App'x 652, 654 (9th Cir. 2015) (upholding consideration of no-action and proposed action alternatives for forest thinning project).

Second, the Final EA explains that a requested "alternative that would meet the project's forest health needs through natural succession" would be addressed by the no action alternative, "which would provide for natural succession by taking no active management." AR12612. This explanation complies with NEPA. *Native Ecosys. Council*, 428 F.3d at 1248-49 (no action alternative addressed plaintiff's proposed alternative and "NEPA does not require federal agencies to consider alternatives that are substantially similar to other alternatives.").

Plaintiff contends this explanation was arbitrary and capricious because a "true natural succession alternative would establish the necessary steps to restore the forest to a natural state." Pl.'s Br. 14. Stated differently, Plaintiff contends that the Final EA was arbitrary and capricious for not considering an alternative that engaged in active management (i.e., "necessary steps") to return the forest to

reference conditions (i.e., "natural state").  But that is precisely what the proposed action is intended to do, and Plaintiff identifies no other specific "necessary steps" that it thinks should have been included in a different action alternative.

Further, even if Plaintiff had identified such steps, NEPA would not require consideration of a separate "active management, natural selection" alternative.  As the court in *North Cascades Conservation Council v. U.S. Forest Service* explained in similar circumstances:

> Here, the Forest Service, in the exercise of its discretion, has properly determined that it is an appropriate purpose for the agency to improve habitat in forest stands in the Project area, including those that contain merchantable timber.  NEPA does not require the Forest Service to scale back its project in favor of an arguably more environmentally-friendly alternative that plaintiffs would prefer.
>
> . . . .
>
> Having evaluated a reasonable range of alternatives in the EA, marked on one end by a no-action alternative and the preferred alternative on the other, and no significant impacts having been found, nor any substantial questions raised by Plaintiffs, it is clear from the case law that the statutory and regulatory duty to discuss alternatives for the Project was met.

*N. Cascades Conserv. Council v. U.S. Forest Serv.*, No. 2:20-cv-01321-RAJ-BAT, 2021 WL 8344155, at *22 (W.D. Wash. May 28, 2021), *adopted by* No. 2: 20-cv-01321-DGE, 2022 WL 1043930 (W.D. Wash. April 7, 2022), *aff'd by* No. 22-35430, 2023 WL 2642930 (9th Cir. Mar. 27, 2023).

Finally, Plaintiff maintains that the Final EA arbitrarily and capriciously declined to consider a "phased approach" to the Project that "would provide for five phases of planning and analysis that would inform the public and allow the public to participate in the planning process at each phase." Pl.'s Br. 15.  But rather than reflecting a substantive alternative to the proposed action that would allow comparison of the potential effects among other alternatives, Plaintiff seeks an

entirely different planning process altogether.  Such an alternative planning process is not the type of "alternative[] to the proposed action" to which NEPA's alternatives requirement applies because the potential effects of a different process cannot be presented in "comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16)." 40 C.F.R. § 1502.14.  Plaintiff cites no legal support for the proposition that NEPA requires consideration of alternative planning processes, and the Final EA's rejection of such an alternative was not arbitrary or capricious.

In short, the Final EA reasonably considered in detail a no-action and proposed action alternative while explaining why additional alternatives were not considered in detail.  Courts routinely uphold similar approaches to complying with NEPA, and the Final EA's consideration of alternatives was neither arbitrary nor capricious.

**B. The Final EA Took a Hard Look at the Project's Potential Impacts**.

Plaintiff maintains that the Final EA failed to take a hard look at the Project's potential impacts because the Project's condition-based management approach makes it impossible to take such a hard look and because the Final EA did not consider potential effects of the Midnight Restoration Project, a project that had not yet been proposed or subject to scoping when the Final EA was issued.  Pl.'s Br. 16-19.  As explained below, both arguments fail.  The Final EA contains a detailed review of the applicable condition-based management and its potential effects that facilitated the type of informed decision-making and public participation NEPA requires.  Moreover, Ninth Circuit precedent that Plaintiff ignores makes clear that the Final EA was not required to consider a potential project that had not yet been proposed or subject to scoping because such a project was not reasonably foreseeable.

"NEPA is a pragmatic device that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (citation omitted). An EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). "The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Tri-Valley CAREs*, 671 F.3d at 1128 (citation omitted). "An EA must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id.* (citation omitted).

### 1. Condition-based Management

As depicted in Figure 6 of the Final EA, the Project's condition-based treatment areas cover about 21,149 acres of the Project area. AR12617 (Figure 6); AR12616 (21,149 acres). About one-third of those acres cover commercial overstory thinning on matrix lands, with the remainder covering non-commercial understory thinning and prescribed fire. AR12617 (Figure 6 showing location of overstory thinning); AR12618 (7,275 acres); AR12621 (explaining understory stand-improvement thinning "non-commercial"). The Final EA contains detailed maps identifying the location of the proposed understory and overstory vegetation treatments on a unit-by-unit basis and the prescribed fire treatments and associated firelines. AR12817-21 (Figures 13-17).

The Forest Service determined the areas for potential condition-based

treatments based on vegetation and fuels data showing "species composition, diameter class, canopy layers, tree and shrub canopy cover, and vegetation clumpiness." AR12526. Initial data was obtained "through aerial photo interpretation, local knowledge, and limited field verification." *Id.* That information was then used to model "stand structures, forest types, and insect and disease vulnerabilities" throughout the Project area. *Id.* Based on that modeling, "[p]atches of similar vegetation composition and structure over 10 acres in size" were identified as forested stands, with "field data sampling" being conducted on a "subset of these stands representing the variety of forest conditions within the analysis area." *Id.*; *see also* AR12527 (noting "field surveys began in 2018," with "[s]ilvicultural and pre-cruise walk-thru exams" occurring across the Project area in 2019). Using this data, the Forest Service established decision criteria for each potential condition-based treatment that will be applied to conditions on the ground to determine whether the treatment will be implemented. AR12616-17. This will ensure "that the right activity occurs on the right location to move the landscape towards the desired condition." AR12616.

For example, the Forest Service used vegetation data to identify the 7,275-acre overstory matrix thinning areas. But as the Final EA contemplates, "some of these areas would not be treated because they do not meet the decision criteria." AR12616; *see also* AR12622-23 (decision criteria for matrix thin). So it is possible that less than the 7,275 acres would be subject to overstory thinning because some stands within the condition-based management area would not meet the decision criteria. But in any event no more than the identified 7,275 acres will receive overstory thinning. Nevertheless, in assessing the potential effects of the Project on various resources, the Final EA considered the maximum potential effects of the Project by assuming all 7,275 acres would be treated. AR12616-17; *see also* AR12532 ("Although actual acres treated would vary across the landscape, the

1    effects of implementing every acre of proposed treatments will be analyzed to

2    clearly show the maximum effect of the proposed treatment.").

3           This approach allowed the Final EA to take a hard look at the Project's

4    potential effects on various resources. *See* AR12634-708. For example, the Final

5    EA assessed the Project's potential effects on NSO habitat, finding that if all

6    vegetation and fuel reduction treatments were implemented, they would remove

7    "877 acres of low-quality" nesting, roosting, or foraging habitat from the Project

8    area, along with 5,141 acres of dispersal habitat. AR12663. Calculation and

9    disclosure of these types of maximum potential effects provides the reasonably

10   thorough discussion of the significant aspects of the probable environmental

11   consequences of the Project that NEPA requires. *See WildEarth Guardians v.*

12   *Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) (upholding EA analyzing

13   "maximum possible effect on lynx habitat" where specific timing and location of

14   vegetation treatments not known). Plaintiff's arguments to the contrary are

15   unavailing.

16          Plaintiff first contends that "[n]o one can possibly know" the potential effects

17   of condition-based management in "roughly 87%" of the Project area "because the

18   point of condition-based management is to wait to specify what logging will occur

19   only *after* the loggers reach the area to be logged." Pl.'s Br. 17 (emphasis in

20   original). This argument misconstrues the Project and condition-based

21   management. As noted above, commercial timber harvest will occur on at most

22   around one-third of the condition-based management area, not the "roughly 87%"

23   of the Project area that Plaintiff misleadingly suggests. And the Final EA details

24   the specific thinning prescriptions and harvest methods that will apply on the stands

25   in that area that meet the decision criteria. *See* AR12723-25 (overstory matrix

26   thinning prescriptions); AR12726-29 (thinning methods and timing).

27          Plaintiff ignores this detailed information in criticizing the Final EA's

28

consideration of the maximum potential effects of condition-based management, maintaining that such effects are unknowable because "there is no possible way the Federal Defendants could determine what the 'maximum' amount of logging is that would supposedly restore the forest to its 'historical' state." Pl.'s Br. 18.  In making this argument, Plaintiff seems to think that the type or intensity of thinning in a given stand will vary under condition-based management.  This misunderstands the Project.  The thinning prescriptions apply to any stands that Forest Service personnel determine meet the decision criteria for inclusion in the overstory thinning.  AR12721-25.  For example, trees up to 21 inches in diameter in a dry forest stand that meets the overstory decision criteria will be thinned from below to leave 20 to 30 trees per acre.  AR12724.

And far from not knowing which treatments would move the forest toward the desired reference conditions, Forest Service specialists developed the applicable prescriptions specifically to "modify stand structures to move departed conditions such as the abundance of young forest multi-story into desired stand structures."  AR12721; *see also* AR12533 (explaining beneficial effects of treatments).  The only issue that condition-based management addresses is whether a stand will be included for treatment.  If it is excluded because it does not meet the decision criteria, there will be no treatment.  If it is included because it meets the decision criteria, it will be treated according to the prescriptions in the EA that the Forest Service determined would move the forest toward desired conditions.  As such, by identifying the most acres that could be subject to treatment, the Final EA did in fact estimate the maximum potential effects of the Project.  Plaintiff's misunderstanding of the Project does not support a NEPA violation.

Finally, Plaintiff seems to suggest that condition-based management is inherently irreconcilable with NEPA.  Pl.'s Br. 19 (noting condition-based management is "antithesis" of what NEPA requires).  But the only case Plaintiff

cites to ostensibly support that proposition is clearly distinguishable. *Id.* at 18 (citing *Or. Nat. Desert Ass'n v. Jewell (ONDA)*, 840 F.3d 562, 570-71 (9th Cir. 2016)).  That case found that an agency had not established adequate baseline conditions because it relied on "inaccurate data" regarding the presence of sage grouse outside of a project area to make assumptions about the potential presence of sage grouse within the project area. *ONDA*, 840 F.3d at 570.  By contrast, here, the Forest Service relied on vegetation data within the Project area to identify locations likely to have stands with certain characteristics that would benefit from thinning or prescribed fire treatments.  This data established a reasonable baseline against which the Project's potential effects could be viewed. *See Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) ("An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method.").

Although not cited by Plaintiff, it is worth noting that the facts of this case are materially different from those in *Southeast Alaska Conservation Council v. U.S. Forest Service*, 443 F. Supp. 3d 995 (D. Alaska 2020), in which a district court found an EIS for a project that applied "'condition-based analysis'" violated NEPA. *Id.* at 1003.  The condition-based approach in that case applied to 1.8 million acres, potentially authorizing 46 different types of activities, including various approaches to timber harvest such as "clear-cut methods." *Id.* at 1000-02.  The project identified 125,529 acres for potential timber harvest, nearly two-thirds of which would be in old-growth forest. *Id.* at 1001.  But the acreage available for timber harvest varied from alternative to alternative without identifying the location of the actual harvest units. *Id.* at 1008.  And the court noted the EIS did not specify the "methods" of harvest that would apply and did "not include a determination—or even an estimate—of when and where the harvest activities or

road construction authorized by each alternative will actually occur." *Id.* at 1002, 1009.  All these facts combined led the court to conclude that the EIS did not foster public participation and informed decision-making.  *Id.* at 1010.

By contrast, the Project area is around *one percent* of the project area at issue in *Southeast Alaska Conservation Council*.  And within that much smaller Project area, the Final EA identifies the specific methods of understory thinning, overstory treatments, and fuels reduction that will be employed and where those methods may be employed.  For example, the below map identifies where within the Project area understory thinning can occur (gray) in relation to the overstory matrix thinning (orange), matrix shaded fuelbreak thinning (tan), regeneration harvest (yellow), and riparian reserve thinning (turquoise).



AR12817.  The Final EA also breaks this map down into three other maps that provide the same information on specific units in the Project area.  AR12818-20.  These various areas correspond to the detailed prescriptions set forth in the Final EA.  AR12722-23 (understory), AR12723-25 (matrix thin), AR12725 (matrix

1    shaded fuelbreak thin), AR12725-26 (regeneration), AR12726 (riparian reserve).[2]

2    And the Final EA explains the methods and timing for the understory and overstory

3    thinning.  AR12726-29; AR12621-22 (Figure 7).

4         That some of these areas may not ultimately be thinned or otherwise treated

5    where on-the-ground conditions differ from those estimated by the Forest Service

6    in no way undermines the usefulness and adequacy of this information in promoting

7    public participation and informed decision-making.    Anyone reviewing this

8    information will know exactly where proposed activities may occur, when they

9    may occur, which prescriptions apply, and which harvest methods may be

10   employed.  NEPA requires nothing more.

11        **2.  Potential Midnight Restoration Project**

12        Plaintiff next argues that the Final EA violated NEPA by not considering the

13   cumulative impacts of a potential project that had not yet been subject to scoping.

14   Pl.'s Br. 19.  Plaintiff is mistaken.

15        In considering a project's cumulative impacts, an agency must consider other

16   "reasonably foreseeable" projects.  *Env't Prot. Info. Ctr. (EPIC) v. U.S. Forest*

17   *Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (citation omitted).  But NEPA does not

18   "require the government to do the impractical," *id.*, and an agency's determination

19   of the scope of its analysis of the effects of reasonably foreseeable actions is subject

20   to deference, *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071

21   (9th Cir. 2002).

22        After the Cedar Creek Fire burned through a portion of the originally

23   proposed project area, the Forest Service decided to remove the areas potentially

24   affected by the fire from consideration in the proposed action.  AR12594.  As noted

25   in the Final EA, these areas were "under assessment to determine the degree to

26

27   [2] The same detail applies to the fuel reduction treatments.  *See* AR12821 (map);

28   AR12729-32 (treatment specifics).

which baseline vegetation and terrestrial habitat conditions were affected [by] fire behavior and suppression activities from the Cedar Creek fire, and to assess whether previously identified or new needs for treatment exist." *Id.* Although a potential project called the Midnight Restoration Project covering these areas was under internal Forest Service consideration, any such project was in its initial planning stages and had not yet been subject to public scoping at the time the Final EA for the Twisp Project was issued. AR12594-95 (noting any needs for areas dropped due to fire "would be addressed by initiating new projects and analyses."); *see also* AR11381 (email to Plaintiff noting no decision on whether to move forward with a project as of March 2022). This shows that the inchoate Midnight Restoration Project was not reasonably foreseeable, and the Final EA had no duty to speculate about any potential cumulative effects of the potential project.

Plaintiff's argument to the contrary ignores *EPIC*, which held in a similar situation that it was not arbitrary or capricious for the Forest Service to omit a project in its initial planning stages from the cumulative effects analysis. 451 F.3d at 1014-15. In that case, the Forest Service had initially proposed a large timber harvest project that was later abandoned. *Id.* at 1014. The Forest Service then approved a timber sale that had been part of that larger project. *Id.* While conducting an EA for that project, the Forest Service had proposed another project that had also been part of the abandoned larger project. *Id.* Despite the common origin of the projects, the court held that it was not arbitrary or capricious for the Forest Service to entirely omit the proposed project from the cumulative effects analysis in the EA because at the time the EA was issued, the "project had just been proposed" and its parameters were unknown. *Id.* at 1014-15.

The same analysis applies here. At the time the Twisp Project Final EA was issued, the Midnight Restoration Project was in its initial planning stages, no decision had been made as to whether such a project would move forward, and no

scoping had occurred.  Thus, it was not arbitrary or capricious for the Final EA to omit the nascent Midnight Restoration Project from its cumulative effects analysis.[3] *See League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014) ("Although projects need not be finalized before they are reasonably foreseeable, they must be more than merely contemplated." (citations omitted)); *Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (finding not arbitrary or capricious to omit projects from a cumulative effects analysis "for which nothing had been completed except notices of intent" (i.e., scoping)).  The Final EA took a hard look at the Project's potential cumulative effects, and Plaintiff's arguments to the contrary are unfounded.

### C. The Forest Service Satisfied NEPA's Public Participation Requirements.

In arguing that the Forest Service violated NEPA's public participation requirement, Plaintiff restates its misguided argument that the condition-based management approved by the Project is somehow antithetical to NEPA.  Pl.'s Br. 20-22.  For the reasons discussed in section II.B.1 above, this argument misunderstands the condition-based management approved by the Project and ignores the relevant analyses in the Final EA and supporting specialist reports.  By estimating stand characteristics throughout the Project area, identifying which of those stands may be thinned or otherwise treated, detailing the prescriptions that would apply to the thinning or treatment in each area, and assessing the potential effects of those actions, the Forest Service provided the public with more than

---

[3] In contrast, the specialist reports supporting the Final EA did address the Twisp Aquatic Restoration Project because implementation of that project was expected to begin soon after April 2022, rendering the project's potential effects reasonably foreseeable.  AR12595.

enough information to actively participate during the development of the Project.

Plaintiff also argues that the Forest Service was required to reopen the public comment period before releasing the Final EA after the Cedar Creek fire burned through a portion of the originally proposed Project area. Pl.'s Br. 21. NEPA contains no such requirement. Indeed, NEPA does not require that a Draft EA even be issued to the public in all circumstances. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008) ("We hold today that the circulation of a draft EA is not required in every case."). Instead, when preparing an EA, an agency need only "provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id.* at 953.

The Forest Service more than met this standard. The Forest Service engaged the public during the scoping period by identifying the proposed project (including the use of condition-based management), hosting an open house, and requesting comments. *See supra* § I.A.3.a. The Forest Service then released an extensive Draft EA, detailing the proposed project and the specific prescriptions that would apply to the proposed understory thinning, overstory treatments, and fuel reduction work, and assessing the potential environmental effects of those actions. *See supra* § I.A.3.b; AR07406-17; AR07513-27. The Forest Service received over 1,000 comments on the Draft EA. AR12606.

After the Cedar Creek Fire burned through a portion of the Project area, the Forest Service presented information "the brevity and clarity" of which "was impressive," at a public meeting before issuing the Final EA. *See supra* § I.A.3.c. And after issuing the Final EA, the Forest Service received and considered objections to the Final EA and draft DN/FONSI, including objections "based on new information that arose after the opportunities for comment." *Id.*; AR12090.

Plaintiff participated in this objection process and has identified no issues it could not raise during that process. *See* AR12162-253. Only after consideration of these comments and objections did the Forest Service approve the Project. This substantial public participation satisfied NEPA. *See Cal. Trout v. FERC*, 572 F.3d 1003, 1017 (9th Cir. 2009) ("[T]he level of participation required by NEPA's implementing regulations is not substantial.").[4]

**D. The FONSI was not Arbitrary or Capricious**.

Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). "Whether an action 'significantly' affects the environment requires analyzing both 'context' and 'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 C.F.R. § 1508.27 (2017)). "Context refers to the setting in which the proposed action takes place," *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(a) (2005)). "Intensity means 'the severity of the impact.'" *Id.* (quoting 40 C.F.R. § 1508.27(b) (2005)). "[T]he regulations identify ten factors that agencies should consider in evaluating intensity." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citing 40 C.F.R. § 1508.27(b)(1)-(10) (2014)). An agency can "reasonably rel[y] on its own expert reports and technical expertise in concluding that the impact of the project would be insignificant." *Bark v. Northrop*, 607 F. App'x at 655. A FONSI "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004).

---

[4] Plaintiff's cursory references to its claims about alternatives and cumulative effects are unavailing for the reasons noted above. Pl.'s Br. 21-22.

The Forest Service considered the context and intensity of the Project as assessed in the Final EA and additional "documentation in the project record," and concluded that preparation of an EIS was not needed because the Project would not "have a significant effect on the quality of the human environment." AR12843. The FONSI and supporting documents fully explain the basis for this conclusion, AR12843-56, providing the "convincing statement of reasons" as to why a project's impacts are insignificant that NEPA requires, *Native Ecosys. Council*, 428 F.3d at 1239 (citation omitted).

In challenging this conclusion, Plaintiff fails to even mention the Project's context and intensity. Pl.'s Br. 22-23. This alone is fatal to this claim. But, even if it were not, Plaintiff's arguments are unfounded. Indeed, Plaintiff suggests that any project intended to protect life and property from wildfire must, by definition, require preparation of an EIS. *Id.* at 23. This is clearly wrong, as courts routinely uphold FONSI's for forest restoration projects like the Project that are intended to improve forest resiliency and reduce the risk of catastrophic wildfire. *See, e.g.*, *Native Ecosys. Council*, 428 F.3d at 1236 (upholding FONSI for thinning and prescribed burning project "designed to reduce the potential for a large-scale, high intensity, stand-replacing fire in the [project] vicinity."); *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1215, 1217-20 (9th Cir. 2017) (upholding FONSI for "forest restoration project" with "commercial timber harvest treatments, road maintenance, stream restoration, and culvert replacements."); *Blue Mountains Biodiversity Proj. v. Trulock*, 2023 WL 3645966, at *1, 18-21 (D. Or. April 27, 2023) (upholding FONSI for 40,000-acre project with 31,000 acres of prescribed burning and 12,220 acres of forest thinning, including 8,190 acres of commercial logging); *Conserv. Cong. v. U.S. Forest Serv.*, 2018 WL 2427640, at *4, (E.D. Cal. May 30, 2018) (upholding FONSI for a project authorizing "vegetation and fuels treatments" to improve forest resiliency and promote old growth habitat).

Plaintiff also argues that an EIS was required because the Project area "is home to a multitude of [ESA] listed species, like the Columbia River spring chinook." Pl.'s Br. 22. But this argument ignores that it is not the presence of ESA-listed species that determines a project's significance; it is the *degree of any effect* of a project on the species. *See EPIC*, 451 F.3d at 1012; *see also Native Ecosys. Council*, 428 F.3d at 1240 ("We decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome."). And it is not enough to show potential effects to individuals of a species. The relevant inquiry is what effect a project will have on the species as a whole. *See EPIC*, 451 F.3d at 1010.

Plaintiff does not identify any effects, much less significant effects, that the Project will have on any ESA-listed species, and the record shows there would be no significant effects. *See* AR12851-55. For example, the aquatics report explains that two components of the Project—decommissioning a campground and a separate campsite—have the "potential for short-term, direct and indirect adverse effects to ESA-listed species." AR11953. The remaining components "would result in a few small, insignificant negative effects to ESA-listed fish and some long-term, insignificant beneficial effects." *Id.* In light of these insignificant effects, NMFS concurred with the Forest Service's determination that the proposed action may affect but would not likely adversely affect two ESA-listed aquatic species (including the spring-run Chinook salmon), explaining that the "combination of no-cut buffers in riparian reserves, harvest and haul management that reduce dust and sediment delivery, proximity of harvest and haul activities from occupied habitat, and implementation of design criteria and minimizing measures reduces the effect of the [Project] to a point of insignificance." AR12134.

Similarly, the wildlife report explained that the Project "would not disturb

any known nesting pairs of northern spotted owls" because no nesting pairs are known to exist "within or adjacent to the project area" despite years of surveys. AR11667.  Nor is there any "high-quality nesting habitat" in the Project area, and a "total of 877 acres of low-quality [nesting/roosting/foraging (NRF) habitat] will be removed from the project area (4% in designated critical habitat)," and around 5,000 acres of dispersal habitat would be removed. *Id.*  In concurring with the Forest Service's determination that the Project may affect but would not likely adversely affect the NSO, FWS explained these effects would be "insignificant" considering "the baseline conditions for northern spotted owl habitat and occurrence in the action area and surrounding areas, in combination with implementation of design criteria and conservation measures." AR12441.  All this supports the Forest Service's finding that the Project would not significantly affect the environment. *See, e.g.*, *Conserv. Cong.*, 2018 WL 2427640, at *15 (upholding FONSI even where project likely to adversely affect NSO under ESA).

Plaintiff also continues to misconstrue the Project's condition-based management as "logging with virtually no oversight," to support its argument that an EIS was required.  Pl.'s Br. 22.  As explained above, however, Plaintiff misunderstands the condition-based management approved by the Project.  Far from raising substantial questions about the Project's potential effects, the Final EA and supporting silviculture specialist report identify exactly where the understory thinning, overstory treatments, and fuel-reduction activities are authorized, specify the prescriptions that apply to each action, and explain how those actions will move the treated areas from their current unnatural conditions to being within the desired historic and future ranges of variability.  AR12616-24; AR12654-55; AR12718-32; AR12816-21.  The Forest Service supported these conclusions with extensive modeling, analysis, and literature.  *See* AR12532-37; AR12548-49; AR12845-46.

Unlike in *Bark v. U.S. Forest Service*, 958 F.3d 865, 870 (9th Cir. 2020), where the court found "[s]ubstantial expert opinion presented by [the plaintiff] during the administrative process" disputing the Forest Service's conclusion that the thinning approved by the project in that case "is helpful for fire suppression and safety," Plaintiff points to no such "substantial expert opinion" that would suggest the effects of the Project are highly controversial or uncertain. As explained by the FONSI, they are not. AR12845-46. In fact, "management activities associated with the [Project] are typical of those successfully implemented on National Forest System lands, including the Okanogan-Wenatchee National Forest." AR12846. As such, the FONSI was not arbitrary or capricious, and Plaintiff's claim fails.

Finally, Plaintiff asks the Court to "remand the [Project] back to the Federal Defendants to prepare a complete EIS." Pl.'s Br. 23. For the reasons discussed above, the FONSI was not arbitrary or capricious and remand is unwarranted. But even if remand were warranted, the proper remedy would not be to remand for preparation of an EIS because where "there is uncertainty over whether the proposed project may have a significant impact, including uncertainty caused by an incomplete administrative record or an inadequate [environmental assessment]," a court "should ordinarily remand for the agency to either prepare a revised [assessment] or reconsider whether an EIS is required." *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1179 (9th Cir. 2008). Ordering the Forest Service to prepare an EIS fails to recognize that the agency still has "a wide variety of actions it may take on remand." *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016, 1035 (9th Cir. 2006).

## CONCLUSION

For the above-stated reasons, Plaintiff's motion for summary judgment should be denied and Defendants' cross-motion granted.

Respectfully submitted this 11th day of August, 2023.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Phone: (202) 532-5973
shaun.pettigrew@usdoj.gov

*Counsel for Defendants*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
U.S. Department of Justice