**William H. Sherlock, OSB #903816**
**lsherlock@eugenelaw.com**
HUTCHINSON COX
940 Willamette Street, Suite 400
P.O. Box 10886
Eugene, Oregon 97440
Telephone: (541) 686-9160
Facsimile: (541) 343-8693
Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

SPOKANE DIVISION

| | |
|---|---|
| **NORTH CASCADES CONSERVATION COUNCIL,** | Case No. 2:22-cv-00293-SAB |
| **Plaintiff,** | **PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **UNITED STATES FOREST SERVICE**, a federal agency of the United States Department of Agriculture, and **KRISTIN BAIL**, in her official capacity as Forest Supervisor, Okanogan-Wenatchee National Forest, United States Forest Service, | |
| **Defendants.** | |

# TABLE OF CONTENTS

I.   ARGUMENT ...................................................................................................5

   A.   Defendants failed to consider a reasonable range of alternatives............................5

      i.   The Twisp Restoration Project as currently planned is not the result of reasonable
           agency discretion and development; it is a preordained outcome around which the
           agency drafted NEPA documents.............................................................................5

   B.   The Final EA fails to fully disclose and analyze the direct, indirect, and
        cumulative impacts of the Twisp Restoration Project.............................................10

      i.   The Final EA's use of condition-based management renders it fatally ambiguous.
           ...............................................................................................................................10

      ii.  The Midnight Restoration Project was reasonably foreseeable when Defendants
           issued the Final EA, rendering its cumulative-impacts analysis deficient as a
           matter of law......................................................................................................15

   C.   Defendants failed to allow meaningful public participation when the Twisp
        Restoration Project changed after the Cedar Creek Fire. .....................................17

   D.   The Twisp Restoration Project will have a significant impact on the human
        environment necessitating preparation of a full Environmental Impact Statement.
        ...............................................................................................................................18

II.  CONCLUSION ...............................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Aina Nui Corp. v. Jewell*, 52 F.Supp.3d 1110, 1119 (D. Hawaii 2014) -------------------- 18

*Bark v. U.S. Forest Service*, 958 F.3d 865, 870 (9th Cir. 2020) ------------------------21, 22

*Cal Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011) ---- 19

*City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407–08 (1985) ---------------------14, 15

*Environmental Defense Center v. Bureau of Ocean Energy Management*,

    36 F.4th 850, 876 (2022)--------------------------------------------------------------6

*Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850,

    879 n.5 (9th Cir. 2022) -----------------------------------------------------------19, 20

*Environmental Defense Center v. Bureau of Ocean Management*,

    36 F.4th 850, 877 (2022) ------------------------------------------------------------- 10

*Environmental Protection Information Center (EPIC II) v. U.S. Forest Service*,

    234 Fed. Appx. 440 (2007) --------------------------------------------------------6, 8, 9

*Environmental Protection Information Center (EPIC) v. U.S. Forest Service*,

    451 F.3d 1005, 1014 (2006) -------------------------------------------------------16, 17

*Friends of Se's Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998)-------------------5

*Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002) --------------------------------------- 17

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008)------------------------ 9, 10

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir. 1999) --------5

*National Parks & Conservation Ass'n (National Parks) v. Bureau of Land Management*,

    606 F.3d 1058 (2010) --------------------------------------------------------------6, 8, 9

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–49 (1989) ------------ 18

*Southeast Alaska Conservation Council v. U.S. Forest Service*,

443 F.Supp.3d 995 (D. Alaska 2020) -------------------------------------------------14, 15

<u>S</u>TATUTES

42 U.S.C. § 4332(2)(C) ----------------------------------------------------------------------- 19

<u>R</u>EGULATIONS

40 C.F.R. § 1508.27(b)(1)–(10)-----------------------------------------------------------19, 20

40 C.F.R. § 1508.27(b)(1) ------------------------------------------------------------------- 20

40 C.F.R. §1501.3(b) ------------------------------------------------------------------------- 22

1    Plaintiff respectfully submits the following legal memorandum in response to

2    Defendants' Cross-Motion for Summary Judgment ("Defendants' Motion") and in reply in

3    support of Plaintiff's own Cross-Motion for Summary Judgment ("Plaintiff's Motion").

4    **I.     ARGUMENT**

5           **A.  Defendants failed to consider a reasonable range of alternatives.**

6
7                  **i.  The Twisp Restoration Project as currently planned is not the
8                       result of reasonable agency discretion and development; it is a
9                       preordained outcome around which the agency drafted NEPA
10                      documents.**
11
12    Defendants maintain the Final EA's purpose and need statement was reasonable.

13    Defendants' Motion, ECF No. 17, at 15. In doing so, they point to several examples of the

14    Ninth Circuit and other courts upholding relatively narrow purpose and need statements.

15    *E.g.*, *id.* (citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir.

16    1999)). Both of the Ninth Circuit's opinions Defendants cite are distinguishable. Both cases

17    involve purpose and need statements that were specifically drafted to meet timber-

18    production and timber-related goals. *See Muckleshoot*, 177 F.3d at 812–13 (Forest Service

19    drafted a narrow purpose and need statement to fulfill a goal set in a previous NEPA

20    document requiring land exchanges with Weyerhaeuser); *Friends of Se's Future v.*

21    *Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) (Forest Service drafted the purpose and

22    need statement to meet specific timber-harvesting goals previously set by the Tongass Land

23    Management Plan). This case is significantly different, because the Twisp Restoration

24    Project ("Project") is, ostensibly, not meant to serve timber goals. TRP_AR_12601–04.

25           Many cases challenging purpose and need statements end in favor of the

26    government, because courts give agencies discretion to frame a project's purpose and need

27    statement. *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36

F.4th 850, 876 (2022). These cases often pay only lip service to the primary limiting rule: purpose and need statements cannot preordain a project's outcome. *Id.* Although such opinions consistently recite that limiting principle, courts routinely fail to apply it. *See id* (mentioning that the purpose and need statement was directly affected by settlement agreements without analysis of whether the outcome was thusly preordained). Regardless, Ninth Circuit precedent as recently as 2022 holds that an agency cannot preordain a project's outcome. *Id.*

One of the best examples of the Ninth Circuit applying this "preordained" limitation on purpose and need statements is *National Parks & Conservation Ass'n (National Parks) v. Bureau of Land Management*, 606 F.3d 1058 (2010). *National Parks* involved a decades-long endeavor by a private mining operation to acquire land around one of its mines for a landfill via a land exchange. *Id.* at 1062. After many years, the proposal reached the Bureau of Land Management ("BLM") for the NEPA process. *Id.* at 1063. BLM ultimately produced a final environmental impact statement with a purpose and need statement that consisted primarily of the private entity's goals, not necessarily BLM's goals. *Id.* at 1070. The Circuit held this express incorporation of private goals was not inherently unreasonable under all circumstances, *id.* at 1070–71, but the court determined the purpose and need statement was drawn too narrowly, *id.* at 1072. The court reasoned that BLM adopting the private entity's interests "as its own" resulted in a purpose and need statement that was "so narrowly drawn as to foreordain approval of the land exchange." *Id.*

Another example comes from *Environmental Protection Information Center (EPIC II) v. U.S. Forest Service*, 234 Fed. Appx. 440 (2007). In *EPIC II*, the Circuit examined a forest-thinning project approved by the Forest Service via an environmental assessment.

1    *Id.* at 442. The environmental assessment analyzed only the no-action alternative and the

2    preferred alternative, which by itself was not necessarily fatal to the agency's NEPA

3    process. *See id.* ("[T]here is no numerical floor on alternatives to be considered[.]" (internal

4    quotation marks and citation omitted). Still, the Circuit held that the Forest Service failed

5    to consider a reasonable range of alternatives for two reasons. *Id.* at 442–44. First, the

6    Forest Service's rejection of alternatives aside from the preferred action meant the Forest

7    Service failed to give "full and meaningful consideration" to reasonable alternatives. *Id.* at

8    443 (internal quotation marks and citation omitted). Second, the Forest Service included a

9    purpose and need statement that precluded all other alternatives aside from the preferred

10   action. *Id.*; *see also id.* at 444 ("Defining a project objective as 'to cover the costs of the

11   forest-thinning by selling timber' eliminates any project that does not provide for a

12   commercial sale.").

13          Returning to the facts of this case, the Final EA and its purpose and need statement

14   were drafted to foreclose any action alternative aside from the preferred action. The Project

15   was created as a collaboration between Defendants and the North Central Washington

16   Forest Health Collaborative ("NCWFHC"). TRP_AR_12606; *see also* Amicus Curiae

17   Brief, ECF No. 22, at 2 ("In fact, the Twisp Project was collaboratively developed and

18   supported by the [NCWFHC]."). The American Forest Resource Council ("AFRC"), who

19   authored the Amicus Curiae Brief filed in this case, is a member of the NCWFHC. Amicus

20   Curiae Brief, ECF No. 22, at 2. Hampton Lumber is a member of AFRC. McCall

21   Declaration, ECF No. 22-4, at 4, ¶6. Hampton Lumber also happens to be the company

22   who stands to collect the timber harvested from at least one of the many timber sale

1   contracts the Project will generate. *Id.* at 6, ¶¶9–10.[1] Put simply, Defendants developed the

2   Project in direct collaboration with the private entity who will profit from the Project.

3          Defendants are surely aware of cases like *National Parks* and *EPIC II*. The agency

4   in *National Parks* expressly adopted goals from a private entity's application for a land

5   swap, 606 F.3d at 1072, and the agency in *EPIC II* transparently stated one of the purposes

6   of the project was "to pay for the [tree] thinning by selling the trees cut," 234 Fed. Appx.

7   at 443. Here, although Defendants ensured the Final EA's purpose and need statement

8   would be opaque compared to the two example cases, the purpose and need statement was

9   nonetheless drafted to select the preordained outcome: a twenty-year-long, phased logging

10  project from which some of Defendants' collaborators will profit. *See* McCall Dec., ECF

11  No. 22-4, at 7–8, ¶12 ("Hampton Tree Farms would be interested in pursuing the other

12  three timber sales associated with the Twisp Restoration Project: [list of timber sales].").

13         The Final EA lists five needs for the project: (1) hydrologic function and aquatic

14  habitat; (2) vegetation composition and structure; (3) wildlife habitat; (4) access and

15  wildfire hazard in the Wildland Urban Interface; and (5) roads. TRP_AR_12601–04. The

16  strategy here is simple: if too many alternatives fit a purpose and need statement, keep

17  adding needs until only the preordained outcome remains. This approach allows a purpose

18  and need statement free of the transparencies present in *National Parks* and *EPIC II*, but it

19  changes nothing about the preordained nature of the Project. Defendants' strategy

20  effectively eliminated all alternatives from consideration except for the no-action

21  alternative and the proposed action. Despite this unreasonable narrowing, Defendants'

---

[1] Although the McCall Declaration in paragraph 10 describes the Hampton Tree Farms contract as a "stewardship contract," paragraph 9 tellingly refers to the same as a "timber sale contract," which is, of course, what the contract actually is. McCall Declaration, ECF No. 22-4, at 6, ¶¶9–10.

1   purpose and need statement could not do away with Plaintiff's proposed alternative, which

2   would have facilitated forest health through natural succession. TRP_AR_12612. Instead,

3   Defendants simply stated that this alternative would have the equivalent effect as the no-

4   action alternative. *Id.* This conclusion was "counter to the evidence before the agency."

5   *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citation omitted).

6          "Need #2" of the Final EA expressly describes the current state of the Project area

7   in part as follows: "Past management practices, including timber harvest and fire

8   suppression, helped change the structure, species composition, and spatial arrangement of

9   forested vegetation in comparison to historical and/or predicted future conditions."

10  TRP_AR_12602. The Final EA goes on to describe the current purported differences in the

11  Project area from historical conditions. *Id.* When Defendants issued the FONSI, selecting

12  the preordained outcome, they rejected the no-action alternative precisely "because it does

13  not meet the needs of the project." TRP_AR_12836. Thus, Defendants rejected the no-

14  action alternative in part because it would fail to restore the Project area to its historical,

15  natural state. At the same time, Defendants lumped in the natural succession alternative

16  with the no-action alternative, even though the purpose of the proposed natural succession

17  alternative would be to meet Need #2, one of the needs Defendants determined the no-

18  action alternative would fail to meet. In this directly contradictory manner, Defendants'

19  decision to dispense with the natural succession alternative as identical in effect to the no-

20  action alternative ran "counter to the evidence before the agency." *McFarland*, 545 F.3d at

21  1110.

22          Other viable alternatives were arbitrarily eliminated from analysis. *See* Plaintiff's

23  Motion at 13–16 (explaining the viability of eliminated alternatives and the arbitrary

reasoning advanced by Defendants). Defendants rely on judicial deference to agency expertise and example cases of courts accepting only two alternatives. Defendants' Motion at 15–17. None of these other cases address whether Defendants, here, failed to consider a viable alternative. *See Environmental Defense Center v. Bureau of Ocean Management*, 36 F.4th 850, 877 (2022) ("The existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate.") (internal quotation marks and citation omitted). Plaintiff is not asking Defendants to consider more than two alternatives purely for the sake of increasing the number of alternatives; Plaintiff's arguments demonstrate that Defendants failed to consider viable alternatives in part by using an unreasonably narrow purpose and need statement to preordain the outcome and in part by advancing arbitrary reasons for eliminating other alternatives "counter to the evidence before the agency." Therefore, the Final EA is arbitrary and capricious, and the court should grant Plaintiff's Motion.

> ### B. The Final EA fails to fully disclose and analyze the direct, indirect, and cumulative impacts of the Twisp Restoration Project.

> > #### i. The Final EA's use of condition-based management renders it fatally ambiguous.

There is no misunderstanding about condition-based management. *See* Defendants' Motion, ECF No. 17, at 17 ("[Plaintiff] misunderstands the Project's condition-based management . . . .").[2] If it does misunderstand, its only because the concept is so vaguely

---

[2] Defendants also strangely take issue with Plaintiff's correct assertion that roughly 87% of the Project area is covered by condition-based management. Defendants' Motion, ECF No. 17, at 23. As Defendants' themselves state, "the Project's condition-based treatment areas cover about 21,149 acres of the Project ['s 24,140-acre area]." *Id.* at 21. 21,149 is roughly 87% of 24,140, hence Plaintiff's assertion. Defendants' comparison between the reported "commercial timber harvest" area with Plaintiff's statement on logging is a false equivalence Plaintiff neither stated nor intended.

1    construed and so amorphous in its concept and application that it is subject to virtually any

2    interpretation.  As described in the Final EA, condition-based management for the Project

3    "allows for making changes based on updated information from field reviews[.]"

4    TRP_AR_12616. Appendix B of the Final EA confirms that any actual prescriptions for

5    logging land designated for condition-based management will be prepared at some

6    indeterminate time in the future. TRP_AR_12766.[3] Accordingly, here, condition-based

7    management means the logging and other timber practices carried out under the Project

8    might be as described in the Final EA, or they might be changed in the future "based on

9    updated information," and the public will never get the chance to review and comment on

10   the actions prior to whatever logging or timber harvesting actually occurs.

11        Condition-based management would normally be contrasted with "designation by

12   prescription," which involves the agency providing the logging contractor a specific

13   prescription for what trees will be cut, where, how they will be removed, and what site

14   remediation is required. *See* McCall Declaration, ECF No. 22-4, at 6–7, ¶11. Although the

15   logging contractor for a portion of this Project describes its "stewardship" contract as a

16   "designation by prescription contract," *id.*, condition-based management is different in a

17   critical way. If the Project involved purely designation by prescription, then presumably,

18   Defendants would have specified in the NEPA documents what prescriptions would

19   actually occur, exactly where they would occur, and exactly when they would occur.

20   However, instead, the Final EA's condition-based management approach allows

---

[3] Appendix B also confirms that loggers will be able to remove any large trees deemed a
"hazard," citing the Occupational Health and Safety Act. TRP_AR_12768. However, the Final
EA fails to describe who will be making these "hazard" determinations or how Defendants will
exercise any oversight on these "hazard" determinations.

1   Defendants to obscure and impermissibly alter what will occur, where it will occur, and

2   when it will occur.

3           As the Final EA puts it, "Unless specified as 'condition-based management', [sic]

4   the locations for the treatments described below have been pre-determined." In other

5   words, for the 87% of the Project area that involves condition-based management, not even

6   the locations for treatment have been pre-determined. Defendants try to hide this reality by

7   explaining how the Final EA and supporting documents describe where certain treatments

8   are "authorized." Defendants' Motion, ECF No. 17, at 34. Under the Project's condition-

9   based management approach, although certain treatments may be "authorized" in certain

10  vast areas within the 37 square mile Project, such authorization still provides no

11  information on where certain treatments will actually occur, when they would occur, if they

12  occur, or if they occur and fail to achieve the desired outcome.

13          Defendants devote several paragraphs to describing the ways the Final EA

14  compiled data to provide the "maximum potential effects" of the Project. Defendants'

15  Motion, ECF No. 17, at 21. Defendants eventually conclude that the Final EA's purported

16  disclosure of the Project's "maximum effects" somehow means the public was fully

17  informed. *Id.* at 27. A closer look at Defendants' statement, however, reveals the Final

18  EA's exact deficiencies: "Anyone reviewing this information will know exactly where

19  proposed activities *may* occur, when they *may* occur, which prescriptions apply, and which

20  harvest methods *may* be employed." *Id.* (emphasis added). Thus, despite all of Defendants'

21  insistence to the contrary, Defendants cannot escape the fact that reviewing the Final EA

22  tells the reader they can speculate all they want, but they will know nothing about what

23  actually occurs over the Project's twenty-year lifespan, only what "may" (or may not)

1    occur. This defect is fatal to the Final EA in several respects, including by eliminating the

2    possibility of determining the Project's actual impact, which is discussed in Section D

3    below

4         This failure to disclose the Project's effects and utter lack of site-specific impacts

5    analysis is compounded by the lack of oversight and monitoring of the contractual

6    "stewards" tasked with carrying out the condition-based management. *See* McCall

7    Declaration, ECF No. 22-4, at 6, ¶10 (providing the logging contractor's explanation of a

8    "stewardship contract"). In this regard, the Final EA makes a surprising and fatal

9    admission: "[A broad monitoring] strategy *is still in development* . . . ." TRP_AR_12628.

10   Thus, although the Final EA describes many different kinds of monitoring that will

11   purportedly occur, including for "thinning operations," TRP_AR_12627, the Final EA

12   admits there was no real strategy to implement monitoring over the 33 square miles of

13   Project area subject to condition-based management. Moreover, the "monitoring" that will

14   occur for the Project's "thinning operations" is only an assessment by Defendants' contract

15   administrators, TRP_AR_12774, but the Final EA contains no explanations for how this

16   assessment functions, whether contract administrators will be present during logging, how

17   often assessments will occur, what criteria will be used to measure compliance, or what the

18   consequences will be if the undefined monitoring demonstrates substantive (and highly

19   likely) abuse of the contract provisions that effectively give free reign to the logging

20   contractors to pick and choose what trees they want to cut.

21        Defendants point out *Southeast Alaska Conservation Council v. U.S. Forest*

22   *Service*, 443 F.Supp.3d 995 (D. Alaska 2020), for the sake of distinguishing its holding

23   from this case. Defendants' Motion, ECF No. 17, at 25. Although not binding on this court,

1    *Southeast Alaska Conservation Council* does provide an interesting comparison, because

2    the district court struck down a logging project in large part due to the use of the same ill-

3    advised condition-based management concept at issue here. 443 F.Supp.3d at 1014–15.

4    The Forest Service in that case made many arguments identical to the ones presented in

5    Defendants' Motion. *E.g.*, *id.* at 1008 ("The Forest Service maintains that it has complied

6    with NEPA by creating a project-level map that 'provide[s] information on where timber

7    harvest and road construction activities *may* take place." (emphasis added); *id.* at 1011

8    ("The Forest Service contends, however, that the EIS satisfies NEPA because it analyzes

9    the Project's maximum potential impacts."). The court rejected those arguments because

10   the NEPA document at issue (an actual EIS versus the EA in the present case) "creates

11   ambiguity about the actual location, concentration, and timing of timber harvest and road

12   construction [in the project area]." *Id.* at 1014.

13        Although *Southeast Alaska Conservation Council* is quite recent, the precedent for

14   rejecting ambiguous logging projects dates back to 1985, if not earlier. *City of Tenakee*

15   *Springs v. Block*, 778 F.2d 1402, 1407–08 (1985), stands for the proposition that agencies

16   must provide specific enough information "to ensure informed decision-making and

17   meaningful public participation." *See Southeast Alaska Conservation Council*, 443

18   F.Supp.3d at 1009 (citing *City of Tenakee Springs* for the stated proposition). *City of*

19   *Tenakee Springs* also involved NEPA documents that failed to specify "where and when

20   harvesting will occur [in the project area]." 778 F.2d at 1408. Under the applicable

21   preliminary injunction standard, the court held the NEPA document's legally untenable

22   ambiguity as to the location and timing of actual timber harvests raised serious questions

1   about the merits of the government's NEPA compliance, thusly entitling the plaintiff to a

2   preliminary injunction. *Id.* at 1407.

3        The Final EA in this case fails to solve the ambiguity issues present in *Southeast*

4   *Alaska Conservation Council* and *City of Tenakee Springs*. Defendants attempt to

5   distinguish *Southeast Alaska Conservation Council* on the basis of that project's larger size

6   and failure to disclose where and when certain treatments "may" occur. Defendants'

7   Motion, ECF No. 17, at 25. It is not clear if Defendants intend to suggest, by making a size

8   comparison, that the Project's twenty-year timespan and 33 square mile area makes the

9   Project short-lived or small. Obviously, the Project is neither. Further, as discussed above,

10  the Final EA's speculative references to the locations and types of treatments that "may"

11  occur fail to provide the public with information on what treatments will *actually* occur,

12  *where* they will occur, or *when* they will occur. The public can be sure that logging and

13  commercial timber harvest will happen repeatedly somewhere in the vast Project area at

14  some indeterminate time within the next twenty years, but that is the extent of what the

15  Final EA reveals to the public (and even then, it might change). This level of ambiguity,

16  spread over a period of twenty years and 33 square miles of condition-based management,

17  fails to fulfill Defendants' obligations under NEPA to analyze the direct, indirect, and

18  cumulative effects of the Project.

19          **ii.  The Midnight Restoration Project was reasonably foreseeable**
20                **when Defendants issued the Final EA, rendering its cumulative-**
21                **impacts analysis deficient as a matter of law.**
22

23      Defendants' assertion that the Midnight Restoration Project ("Midnight") was not

24  "reasonably foreseeable," Defendants' Motion, ECF No. 17, at 27, is absurd and

25  disingenuous. On March 17, 2022, District Ranger Chris Furr wrote to Plaintiff: "The early

1    indications are that there is still a need for treatments post-fire, and I think it's likely that

2    Midnight will be developed as a project." TRP_AR_11381.[4] This was over four months

3    before Defendant Bail signed the Twisp Project FONSI. TRP_AR_12860. Thus, the

4    District Ranger in charge of overseeing the project area knew months before Defendants

5    issued the FONSI that Midnight was likely to move forward. More importantly, Ranger

6    Furr told Plaintiff that Midnight was "simply the area left behind from the original Twisp

7    Restoration," TRP_AR_11381, meaning he was also aware of Midnight's scope months

8    before Defendants issued the Final EA and FONSI.

9        The case cited by Defendants, *Environmental Protection Information Center*

10   *(EPIC) v. U.S. Forest Service*, 451 F.3d 1005, 1014 (2006), is easily distinguishable. In

11   *EPIC*, the agency did in fact provide analysis of the second project in response to comments

12   on the EA. *Id.* at 1014–15. The court did not require the agency to do more because "not

13   enough information [was] available to permit meaningful consideration[.]" *Id.* at 1014

14   (citation omitted). Requiring the government to provide analysis without information was,

15   according to the court, asking the agency "to do the impractical." *Id.*

16       In contrast, the Administrative Record in this case unequivocally demonstrates that

17   Defendants knew Midnight was not only "likely" to occur but that Defendants knew

18   Midnight would occur in the remainder of the original Twisp Restoration Project area. It is

19   not entirely clear in *EPIC* to what extent the agency had developed the larger, "abandoned"

20   project, but in this case, Defendants had fully analyzed the effects of the treatments

21   proposed for the Midnight project area in the Draft EA issued for the Project. Defendants

---

[4] Although not relevant for this court's determination on the Administrative Record, it is worth
noting the Midnight Restoration Project is indeed moving forward with scoping. *See* Midnight
Restoration Project, Overview, available at
https://www.fs.usda.gov/project/?project=63933&exp=overview.

thus had more than sufficient information to give the Project's cumulative effects in conjunction with Midnight "meaningful consideration." Such meaningful consideration cannot be deferred to the future. *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002). Therefore, because Defendants undeniably had abundant information to give "meaningful consideration" to the cumulative effects of the Project with Midnight, but failed to do so, Defendants blatantly violated NEPA for this reason as well. Accordingly, the court should grant Plaintiff's Motion.

### C. Defendants failed to allow meaningful public participation when the Twisp Restoration Project changed after the Cedar Creek Fire.

Defendants' Motion describes how they "more than met [the] standard" to allow public input after the Cedar Creek Fire. Defendants' Motion, ECF No. 17, at 30. Oddly, a full paragraph of Defendants' Motion is devoted to describing the public input and participation that occurred prior to both the issuance of the Draft EA and the Cedar Creek Fire, *id.*, which is of course irrelevant to Plaintiff's argument about what occurred after the Draft EA and fire. It is undisputed that subsequent to the Cedar Creek Fire, which occurred after completion of the Draft EA, Defendants dramatically altered the Project without opportunity for public input. *See* Plaintiff's Motion, ECF No. 15, at 4–5 (describing the changes from Draft EA to Final EA).

It cannot be rationally disputed that federal agencies undertaking the NEPA process must reopen the public comment period if the agency makes critical changes or adds critical new information. *Aina Nui Corp. v. Jewell*, 52 F.Supp.3d 1110, 1119 (D. Hawaii 2014). This mandate goes to the very heart of NEPA's foundational purpose of encouraging public participation in the decision-making process. *Robertson v. Methow Valley Citizens*

1   *Council*, 490 U.S. 332, 348–49 (1989). Defendants' attempts to justify their violation of

2   this foundational purpose fall short.

3            NEPA requires more than informing the public; NEPA requires meaningful public

4   *participation* in the decision-making process. Defendants did not provide opportunities for

5   decision-level, post-fire meaningful public participation by presenting information at a

6   public meeting. Defendants' Motion, ECF No. 17, at 30. Nor did Defendants allow

7   meaningful decision-level public participation by receiving objections during the

8   mandatory objection period following issuance of the Final EA. *Id.* Nor does Plaintiff's

9   ability to file objections to the Final EA indicate that the public had meaningful opportunity

10  to guide Defendants' decision on the Project. *Id.* The critical issue here is the 50,000-acre

11  change in the scope of the Project between the Draft EA and the Final EA that effectively

12  bifurcated the Twisp project from the Midnight proposal. The Cedar Creek Fire was *exactly*

13  the kind of critical new information that introduced critical new changes to the Project as

14  presented in the Draft EA. Under those circumstances, Defendants were required to reopen

15  the Project for public comment before preparing and issuing the Final EA. They failed to

16  do so. Therefore, Defendants again violated NEPA, and the court should grant Plaintiff's

17  Motion.

18           **D. The Twisp Restoration Project will have a significant impact on the**
19               **human environment necessitating preparation of a full Environmental**
20               **Impact Statement.**
21

22           Defendants fail to provide a reasonable explanation for how a project specifically

23  designed to protect the human environment would not significantly affect the human

24  environment. 42 U.S.C. § 4332(2)(C). Defendants' Motion mentions context and intensity

25  determinations, including the ten intensity factors previously found at 40 C.F.R. §

1508.27(b)(1)–(10). Those regulations were amended prior to issuance of the Final EA.
*See Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850,
879 n.5 (9th Cir. 2022) (courts apply "the regulations in place at the time of the challenged
decision"); *see also id.* (the regulations were revised on July 16, 2020, in 85 Fed. Reg.
43,304). Thus, it is not entirely clear that those regulations apply to the Final EA at all.
Even so, Plaintiff will present arguments on these factors in the event this court considers
them, because those regulations strongly support Plaintiff's Motion.

Importantly, Plaintiff only has to raise "substantial questions" to prevail on this
claim. *Environmental Defense Center*, 36 F.4th at 878–79. There is no requirement for
Plaintiff to prove that any significant environmental effects are certain to occur.[5] *Id.*
Plaintiff easily meets this "low standard." *Id.* at 879 (citing *Cal Wilderness Coal. v. U.S.
Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011)).

Under the "significance factors" set out at former 40 C.F.R. § 1508.27, meeting
even one of the ten factors can be sufficient to require an agency to prepare a full
environmental impact statement ("EIS"). *Environmental Defense Center*, 36 F.4th 850, 879
(2022). Impacts both harmful and beneficial are relevant to a project's intensity. 40 C.F.R.
§ 1508.27(b)(1). A project's intensity is also dependent on the extent "to which the
proposed action affects public health or safety." *Id.* § 1508.27(b)(2). Another factor
requires agencies to consider whether the effects of a project "are likely to be highly
controversial." *Id.* § 1508.27(b)(4). Agencies must also consider whether and to what
extent a project's effects "are highly uncertain or involve unique or unknown risks." *Id.* §
1508.27(b)(5). A project's effect will also be significant under these intensity factors if the

---

[5] This is an additional reason why Defendants' argument about the expert opinions in *Bark* fails.

agency should reasonably "anticipate a cumulatively significant impact" of the project combined with other related projects. *Id.* § 1508.27(b)(7). The Project implicates each of these factors to the extent than any single factor by itself is enough to require Defendants to prepare a full EIS.

Defendants should certainly hope the Project will have a significant beneficial effect on the human environment, because the fourth stated purpose of the Project is to reduce fire intensity and wildfire potential on the Wildland Urban Interface ("WUI"). These beneficial Project effects merit equal consideration under the intensity factors. This aspect of the Project also goes directly to the intensity factor requiring consideration of the Project's effect on public health and safety. If the Project will have no significant effect on public health and safety, despite that being one of the Project's expressly stated needs, then why are they doing the Project? Consequently, the agency's decision to move forward with the proposed action was "counter to the evidence before the agency," and therefore arbitrary and capricious. None of the cases Defendants cite are on-point, because none of those cases appear to involve a purpose and need statement that expressly incorporates public safety along the WUI, as the Project's does here. This factor by itself requires Defendants to prepare a full EIS.

Furthermore, Defendants are aware that tree thinning's effectiveness reducing fire risk is *highly* controversial; their Motion cites to the 2020 Ninth Circuit case that makes that express finding. Defendants' Motion, ECF No. 17, at 35 (citing *Bark v. U.S. Forest Service*, 958 F.3d 865, 870 (9th Cir. 2020)). *Bark* came out prior to the Final EA, meaning Defendants were well aware of it.

1      Defendants' attempt to distinguish *Bark* on the basis of "expert opinion" overlooks

2    the fact that the Ninth Circuit expressly refused to engage "in a battle of the experts." *Bark*,

3    958 F.3d at 871. The Ninth Circuit pointed to the plaintiffs' expert opinions, not because

4    the court considered the opinions themselves over the agency's experts, but because the

5    existence of these differing opinions demonstrated the Forest Service's failure "to consider

6    all important aspects of a problem." *Id.* The Forest Service's final decision entirely failed

7    to engage with the plaintiffs' offered scientific analysis. *Id.* Here, Defendants' FONSI

8    demonstrates an identical failure to the Forest Service's failure in *Bark*.

9       The FONSI contains a single paragraph discussing whether the Project is likely to

10   be highly controversial. TRP_AR_12845. The FONSI concludes the Project is unlikely to

11   be highly controversial simply because Defendants offered scientific support for its

12   conclusion. *Id.* In doing so, Defendants ignored Plaintiff's and the general public's

13   comments on the scientific disagreement over the efficacy of thinning on wildfire

14   prevention, which was exactly the problem in *Bark*. Again, it was not the *Bark* Plaintiff's

15   expert opinions that made the difference, it was the agency's abject failure to even consider

16   the scientific disagreement in the first place. Defendants here committed the same error by

17   utterly failing to engage with, distinguish, or refute, a contrary opinion, despite Plaintiff's

18   comments and the *Bark* opinion. *See, e.g.*, TRP_AR_10553–54 (Plaintiff's member's

19   comments on the scientific assumptions and counterpoints to thinning as effective fire

20   suppression). This factor by itself requires Defendants to prepare a full EIS.

21      Because the Project proposes condition-based management over a period of twenty

22   years, a period during which projects like Midnight will be developed, the Project's effects

23   are unknown. The degree of uncertainty involved with this Project and its cumulative

1    impact combined with related projects like Midnight is discussed in Section B above. These

2    aspects of the Project figure equally into the controversial nature of the Project. Therefore,

3    these intensity factors also require Defendants to prepare a full EIS.

4        Although stated with significantly less specificity, the regulations in place when

5    Defendants issued the Final EA involved many of the same considerations. *See* 40 C.F.R.

6    §1501.3(b) (requiring consideration of, *inter alia*, beneficial and harmful effects and effects

7    on public health and safety). Under these regulations, too, Defendants were required to

8    prepare a full EIS, for the reasons stated above and in Plaintiff's Motion. The Project is a

9    twenty-year-long logging and road-building endeavor covering 33 square miles of forest

10   that lacks information indicating exactly when, where, and to what extent logging and

11   timber harvest will occur. There are "substantial questions," at the very least, whether the

12   Project will significantly affect the human environment. Therefore, under either set of

13   regulations, Defendants were obligated to prepare a full EIS, and/or an amendment to their

14   forest management plan, and the court should grant Plaintiff's Motion.

15   **II.    CONCLUSION**

16       For the foregoing reasons, the Federal Defendants failed to satisfy their obligations

17   under NEPA and the APA. Accordingly, the court should grant Plaintiff's Motion for

18   Summary Judgment, vacate the FONSI, remand the Project back to Defendants, and enjoin

19   the Project from moving forward unless and until Defendants fully comply with the law.

20       DATED this 15th day of September, 2023.

HUTCHINSON COX

By: _____
     William H. Sherlock, OSB #903816
     Of Attorneys for Plaintiff

21

1            **CERTIFICATE OF SERVICE**

2       I certify that on <u>September 15, 2023</u>, I served or caused to be served a true and

3 complete copy of the foregoing **PLAINTIFF'S COMBINED RESPONSE TO**

4 **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY**

5 **IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

6 on the party or parties listed below as follows:

      ☒    Via CM / ECF Filing

      ☐    Via First Class Mail, Postage Prepaid

      ☐    Via Email

      ☐    Via Personal Delivery

7

8       TODD KIM
9       Assistant Attorney General
10     Environment & Natural Resources Division
11     U.S. Department of Justice
12
13     SHAUN M. PETTIGREW (CA State Bar No. 254564)
14     Senior Trial Attorney
15     Natural Resources Section
16     c/o NOAA, Damage Assessment
17     7600 Sand Point Way, NE
18     Seattle, WA 98115
19     shaun.pettigrew@usdoj.gov
20
21     *Attorneys for Federal Defendants*
22
23     HUTCHINSON COX
24
25

26     By: _____
27         William H. Sherlock, OSB #903816
28         Of Attorneys for Plaintiff