TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

SHAUN M. PETTIGREW (CA State Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(206) 526-6881
shaun.pettigrew@usdoj.gov

*Attorney for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NORTH CASCADES CONSERVATION COUNCIL, a nonprofit Washington corporation;<br><br>*Plaintiff,*<br><br>v.<br><br>U.S. FOREST SERVICE, a federal agency of the United States; and KRISTIN BAIL, in her official capacity as Forest Supervisor, Okanogan-Wenatchee National Forest, U.S. Forest Service,<br><br>*Defendants,* | Case No. 2:22-cv-00293-SAB<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.    ARGUMENT ................................................................................................1

    A.    The Project's Purpose and Need was Not Unreasonably Narrow
        and the Final EA Considered a Reasonable Range of Alternatives ......1

        1.    Purpose and Need Statement ......................................................1

        2.    Reasonable Range of Alternatives ............................................3

    B.    The Final EA Took a Hard Look at the Project's Potential Impacts
        ......................................................................................................4

        1.    Condition-based management ....................................................4

        2.    Potential Midnight Restoration Project ...................................10

    C.    The Forest Service Satisfied NEPA's Public Participation
        Requirements ........................................................................................12

    D.    The FONSI was not Arbitrary or Capricious ......................................12

II.    CONCLUSION ...........................................................................................15

# TABLE OF AUTHORITES

Page(s)

**Cases**

*Akiak Native Cmty v. U.S. Postal Service,*
   213 F.3d 1140 (9th Cir. 2000)................................................................3

*All. for the Wild Rockies v. Weber,*
   979 F. Supp. 2d 1118 (D. Mont. 2013) ...........................................13

*Bark v. U.S. Forest Service,*
   958 F.3d 865 (9th Cir. 2020) ..................................................... 13, 14

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
   524 F.3d 938 (9th Cir. 2008)..............................................................12

*City of Tenakee Springs v. Block,*
   778 F.2d 1402 (1985) ...........................................................................8

*Council v. U.S. Forest Serv.,*
   No. 2:20-cv-01321-RAJ-BAT, 2021 WL 8344155 (W.D. Wash. May 28, 2021) 4

*Earth Island Institute v. Muldoon,*
   --- F.4th ---, 2023 WL 5921619 (9th Cir. Sept. 12, 2023) ...................15

*Earth Island Institute v. U.S. Forest Service,*
   697 F.3d 1010 (9th Cir. 2012)..............................................................4

*Envt. Prot. Info. Ctr.v. U.S. Forest Serv.,*
   234 F. App'x 440 (9th Cir. 2007).....................................................3, 4

*Great Basin Res. Watch v. BLM,*
   844 F.3d 1095 (9th Cir. 2016) ............................................................5

*Hapner v. Tidwell,*
   621 F.3d 1239 (9th Cir. 2010) ..................................................... 13, 15

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.,*
   545 F.3d 1147 (9th Cir. 2008)............................................................3

*Nat'l Parks & Conservation Ass'n v. BLM,*
   606 F.3d 1058 (9th Cir. 2010)............................................................2

*Neighbors of Cuddy Mountain v. U.S. Forest Service,*
   137 F.3d 1372 (9th Cir. 1998).............................................................5

*Smith v. U.S. Forest Serv.*,
  33 F.3d 1072 (9th Cir. 1994) ........................................................................ 9, 10

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) ...........................................................................5

Defendants submit the following reply in support of their cross-motion for summary judgment.

## I.    ARGUMENT

### A. The Project's Purpose and Need was Not Unreasonably Narrow and the Final EA Considered a Reasonable Range of Alternatives.

#### 1.  Purpose and Need Statement

The Forest Service identified five needs related to improving forest resiliency, three of which addressed modifications to vegetation and forest stands: (1) bring vegetation within historic and future ranges of variability; (2) create and maintain wildlife habitat, including late and old forest structure stands; and (3) modify forest stands in and next to the wildland urban interface (WUI) to reduce fire intensity and enable direct firefighting strategies to protect life and personal property, and reduce fire intensity outside of the WUI.  AR07006-09.  Plaintiff continues to insist that these needs were unreasonably narrow, preordaining the agency's consideration of alternatives.  Pl.'s Resp. 5-10, ECF No. 25.  But nothing in the statement of needs preordains a specific project or form of vegetation management.  Indeed, the Project ultimately authorized a variety of strategies to meet these needs, including non-commercial understory thinning, commercial overstory treatments, and fuel reduction through piling, pile burning, and underburning.  Only one of these involves the kind of commercial timber harvest Plaintiff suggests the statement of needs preordained.

Rather than seriously engage with the Forest Service's broadly stated needs, Plaintiff resorts to casting aspersions on Ninth Circuit opinions, claiming they "pay only lip service" to the limitation that purpose and need statements cannot be so narrow as to preordain the consideration of alternatives.  Pl.'s Resp. 5-6.  In doing so, Plaintiff invites the Court to ignore Ninth Circuit caselaw upholding purpose and need statements far narrower than that identified by the Forest Service here.

DEFS.' REPLY IN SUPP. CROSS-MOT. SUMM. J.  1

*See* Defs.' Br. 15 (gathering cases), ECF No. 17. But that caselaw is binding, and the Court should decline Plaintiff's invitation. Instead, the Forest Service's statement of needs was reasonable and well within the agency's discretion, and the two cases relied on by Plaintiff to argue otherwise are easily distinguishable.

In approving a land exchange that would allow a private company to develop a landfill, the agency in *National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058, 1071-72 (2010), relied almost exclusively on the needs of the private company rather than on the agency's own needs. The court found this to be unreasonable because an agency cannot "draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives." *Id.* at 1072. By contrast, here, all the needs identified by the Forest Service go to the agency's management of the Forest to improve its resiliency rather than the needs of any private entity. To be sure, private companies may benefit from the commercial timber harvest that the Forest Service determined would improve forest health, but that is far different from narrowly drafting a statement of needs to meet a private proponent's needs without considering those of the agency.

Plaintiff misunderstands this distinction in arguing that the Forest Service somehow violated NEPA because "Defendants developed the Project in direct collaboration with the private entity who will profit from the Project." Pl.'s Resp. 8. But far from "collaborating" with a single private entity that would benefit from commercial timber harvest, the Forest Service "engaged with members of the North Central Washington Forest Health Collaborative during project development." AR12606. The Collaborative comprises a diverse coalition of members with interests in forest management, ranging from environmental organizations to local governments to timber industry representatives. *See* Partin Decl. ¶ 7, ECF No. 22-1. Engagement with this diverse group in no way narrowed the Forest Service's

statement of needs to serve private interests.

The other case relied on by Plaintiff faulted the Forest Service for defining one of the project's objectives "to cover the costs of the forest-thinning by selling timber." *Env't Prot. Info. Ctr. (EPIC II) v. U.S. Forest Serv.*, 234 F. App'x 440, 444 (9th Cir. 2007). The court found that by including this as a purpose of the project, the Forest Service unreasonably constrained the consideration of alternatives to "a commercial logging project." *Id.* at 443. But this unpublished case is inapposite because the Project's needs contain no such objective.

The best Plaintiff can do in light of these clear distinctions is to suggest the Forest Service engaged in subterfuge to avoid these holdings by ensuring the "purpose and need statement would be opaque compared to the two . . . cases." Pl.'s Resp. 8. Not only does this claim ignore the Forest Service's detailed years-long approach to identifying the needs for the Project, *see* Defs.' Br. 3-7, but it also ignores that the Forest Service is entitled to a presumption of regularity in its NEPA decision-making process, *Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1146 (9th Cir. 2000) (noting "agency's decision-making process is accorded a 'presumption of regularity.' (citation omitted)). Baseless supposition by Plaintiff does not overcome that presumption. The Forest Service's statement of needs fully complies with NEPA.

### 2. Reasonable Range of Alternatives

The Final EA considered in detail a no-action alternative and an action alternative, and explained why other proposed alternatives were not considered in detail. *See* Defs.' Br. 16. This consideration of alternatives satisfied NEPA's requirement that an EA "include a brief discussion of reasonable alternatives." *Id.* (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). Despite the Ninth Circuit being clear that consideration of "both a no-action and preferred action alternative" in an EA generally satisfies

NEPA, *Earth Island Institute v. U.S. Forest Service*, 697 F.3d 1010, 1021-22 (9th Cir. 2012), Plaintiff continues to insist that the Forest Service had to consider a "natural succession alternative," Pl.'s Resp. 9.

But as noted in Defendants' opening brief, Plaintiff never details what it means by a "natural succession alternative." Defs.' Br. 18-19. If it means taking no action and letting nature take its course, such an alternative is covered by the no-action alternative. *Id.* at 18. If it means acting to move the forest toward desired reference conditions, then that is what the proposed action alternative considered, and Plaintiff identifies no other specific actions that it thinks should have been included in a different action alternative. *Id.* at 18-19. And, even if Plaintiff had, the Forest Service was under no obligation to consider such an alternative. *Id.* at 19 (citing *N. Cascades Conserv. Council v. U.S. Forest Serv.*, No. 2:20-cv-01321-RAJ-BAT, 2021 WL 8344155, at *22 (W.D. Wash. May 28, 2021)).

Plaintiff continues to rely on *EPIC II* to argue that the Final EA should have considered more than two alternatives. Pl.'s Resp. 6-7. But unlike this case, where the Final EA discussed the Forest Service's reasons for not considering additional proposed alternatives in detail, *EPIC II* involved the agency's "cursory dismissal" of proposed alternatives as inconsistent with the purpose and need for the project. 234 F. App'x at 443. And other than claiming in passing that "[o]ther viable alternatives were arbitrarily eliminated from analysis," Pl.s' Resp. 9, Plaintiff fails to respond to the Final EA's fully supported explanations as to why additional proposed alternatives did not meet the needs of the Project. *See* Defs.' Br. 16-20. The Final EA's consideration of alternatives fully satisfied NEPA.

**B. The Final EA Took a Hard Look at the Project's Potential Impacts.**
### 1. Condition-based management

The condition-based management approved by the Project is transparent and predictable, providing more than sufficient information to promote the kind of

public participation and informed decision-making NEPA requires.  Plaintiff's arguments to the contrary misunderstand the Project, omit relevant record information, and fail to appreciate the dynamic nature of forest restoration work. Indeed, under Plaintiff's view of NEPA, any form of forest management that provides flexibility in implementation necessarily violates NEPA.  That is not the case.  NEPA requires only that an EA provide a "reasonably thorough discussion of the significant aspects of *probable* environmental consequences," *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1376 (9th Cir. 1998) (emphasis added), such that the totality of the circumstances "permit members of the public to weigh in with their views and thus inform the agency decision-making process," *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012).  The Final EA easily cleared this threshold.

Using known existing information, limited field verification, and modeling to determine stand structures, forest types, and insect and disease vulnerabilities throughout the 21,149-acre Project area, the Forest Service relied on its expertise to identify those areas that would benefit from non-commercial understory thinning, commercial overstory treatments, and fuel reduction activities.  *See* Defs.' Br. 21-22.  This approach to understanding and disclosing conditions throughout the Project area complies with NEPA.  *See Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (noting agency can rely on "data from a similar area, computer modeling, or some other reasonable method.").

The Forest Service also transparently acknowledged that some uncertainty existed as to the actual on-the-ground conditions and wanted to ensure "that the right activity occurs on the right location to move the landscape towards the desired condition." AR12616.  To do this, the Final EA disclosed detailed decision criteria that will be applied during Project implementation to ensure the actual conditions on the ground meet the expected conditions disclosed in the Final EA.  If they do,

then the approved treatment will be applied.  If they do not, then the treatment will not be applied.

In particular, the Final EA's description of condition-based management details the decision criteria for each approved activity, specific prescriptions that will be applied if those decision criteria are met, maps identifying where those prescriptions would be applied, and estimates of the timing of implementation. AR12616-24, AR12718-32, AR12816-22.    Although Plaintiff tends to misleadingly conflate the three approved activities (i.e., non-commercial understory thinning, commercial overstory treatments, and fuel reduction activities) as "logging and other timber practices," Pl.'s Resp. 11, its primary concern seems to be information disclosed as to the commercial overstory thinning to which condition-based management applies.  A review of that information shows that the Final EA took a hard look at the Project's potential impacts.

The Final EA disclosed that condition-based management for commercial overstory thinning would apply to at most 7,275 acres of the 21,149-acre Project area.  AR12616; AR12618; AR12622.  And it mapped the specific unit-by-unit location of those 7,275 acres (denoted in orange as "Matrix Thin"):



AR12819; *see also* AR12818 (map of upper third); AR12820 (map of lower third).

But as the Final EA candidly acknowledged, despite relying on the best available information to estimate conditions in these units, some of the units may deviate from those estimates such that they would not benefit from overstory thinning. AR12616. As a result, such thinning will apply only if the units meet the following decision criteria detailed in the Final EA: (1) the slope is less than 80 percent and within 1 mile of a National Forest System road; (2) there are more than 50 trees per acre that exceed 7 inches in diameter; (3) the stand structure is either young forest multi story, stem exclusion closed canopy, understory re-initiation, or stem exclusion open canopy, as defined in Appendix A of the Final EA; and (4) the units could produce enough timber volume to be commercially viable. AR12622.

If a unit does not meet all these criteria, it will not be subject to overstory thinning. If a unit does meet all these criteria, it will be thinned according to the prescriptions set forth in the Final EA. For units in dry forest, trees up to 21 inches in diameter would be thinned from below (i.e., first removing trees in the understory, then the midstory, and then the overstory, which leaves predominantly larger diameter trees in achieving the desired stand density) until there were 20 to 30 trees per acre greater than 10 inches in diameter. AR12721; AR12724. This would result in a minimum of 70 to 105 trees per acre in these units with various size classes, creating "a mosaic of forest structures including old forest multi or single storied stands." AR12724. Slightly modified prescriptions would apply to units in moist forest. AR12724-25. Application of these prescriptions would "develop, maintain, or restore healthy stand structures in the project area that respond to disturbances such as wildfire and climate change in a resilient manner and are consistent with historic and future ranges of variability." AR12602 (need two); AR12726 (noting objective of overstory thinning to meet need two).

And implementation of this overstory thinning would not occur at some

indeterminate time over the course of twenty years.  Rather, the Final EA explained that commercial harvest associated with the overstory thinning "would likely occur in three phases with each phase typically implemented over a three to five-year period."  AR12621.  The Final EA then disclosed that "[i]mplementation of Phase 1 (Lookout) would likely begin within the first year of project implementation with Phase 2 (Newby) and Phase 3 (Woodpecker) likely starting at one-year intervals after the initial phase," *id.*, as reflected in the below map (AR12622):



All this provided the public with ample information to understand the scope of the Project and its potential environmental consequences, and it reflects the precise kind of informed decision-making that NEPA is intended to foster. Plaintiffs now rely on *City of Tenakee Springs v. Block*, 778 F.2d 1402 (1985), to support a different conclusion.  Pl.'s Resp. 14.  But that case concerned the complete lack of information in an environmental impact statement about potential timber harvest on 750,000 acres of land.  *Id.* at 1407-08.  As the court noted "[i]t is impossible to determine where and when harvesting will occur on the 750,000 acres of land."  *Id.* at 1408.  The Final EA contains no similar deficiency.

Perhaps realizing that a cursory look at the Final EA would reveal a detailed

explanation of condition-based management that easily meets NEPA's hard-look mandate, Plaintiff now argues for the first time in its response brief that the Forest Service somehow violated NEPA by not detailing precisely how it would monitor implementation of the Project. *See* Pl.'s Resp. 13. Plaintiff is mistaken.

The Project requires implementation of various design features, monitoring, and mitigation measures as disclosed in Appendix B of the Final EA. AR12744-78. The monitoring disclosed in Appendix B is extensive and includes monitoring specific to thinning operations and fuel treatments. AR12774. For thinning operations, monitoring will be conducted to ensure the thinning is implemented consistent with the thinning prescriptions and various other requirements. *Id.* For fuel treatments, Forest Service personnel will "assess fuel loading during and following the fuel treatments. *Id.* As the Final EA made clear, "[d]uring contract development and project implementation, agency staff would regularly evaluate treatments to assure that design features are addressed as specified." AR12626.

Although the Final EA acknowledged that "the Forest Service is working with its partners in developing a broad monitoring strategy for implementation of the Twisp Restoration Project," AR12775-76, NEPA does not demand the kind of detailed implementation monitoring plan Plaintiff desires, and Plaintiff cites no legal authority to support its argument. Indeed, Plaintiff's argument continues to ignore the presumption of regularity to which the Forest Service is entitled, and Plaintiff has brought forth no evidence that in any way suggests the Project will not be implemented as set forth in the Final EA. *Cf. Smith v. U.S. Forest Serv.*, 33 F.3d 1072, 1077 n.2 (9th Cir. 1994) (applying presumption of regularity absent "evidence of a nefarious motive" by the Forest Service). Wholesale speculation that the contractor will violate the Project's approved prescriptions during implementation does not support a NEPA violation.

DEFS.' REPLY IN SUPP. CROSS-MOT. SUMM. J.  9

1

### 2. Potential Midnight Restoration Project

The Cedar Creek fire burned through part of the original Project area in August 2021. AR12594. In response, the Forest Service removed areas potentially affected by the Fire from the Project. *Id.* As explained in the Final EA, among other effects, the Fire likely "increased levels of fuel created by snags collapsing, which can negatively impact late successional habitat and delay habitat recovery by elevating the fuel loading over time and increasing the possibilities for short return intervals of more severe, stand-replacing wildfires." AR12602. Thus, the Final EA disclosed that those areas removed from the Project area were "under assessment to determine the degree to which baseline vegetation and terrestrial habitat conditions were affected" by the Fire and "to assess whether previously identified or new needs for treatment exist." AR12594. The Final EA further noted that areas "severely impacted by the Cedar Creek fire may benefit from fire restoration treatments. If these needs are identified, they would be addressed by initiating new projects and analyses." AR12594-95.

In other words, at the time the Final EA was issued, the Forest Service was still assessing the effects of the Cedar Creek fire to determine whether previously identified or new treatments would be beneficial and, if so, whether to initiate new projects and analyses to cover these areas. Courts regularly find that the potential environmental effects from such inchoate future projects are too uncertain to permit meaningful analysis, even if a potential project arose from an earlier abandoned project. *See* Defs.' Br. 27-29.

Plaintiff cites no case in which a court required analysis of the cumulative effects of a potential project before it reached the NEPA scoping stage, instead relying on an email from the District Ranger from March 2022 to claim that the Forest Service knew a project would likely be proceeding in the area removed due to the Cedar Creek fire. Pl.'s Resp. 15-16. But that email clearly explained that no

decision had been made as to whether treatments in the removed areas would be proposed as a separate project. AR11381 (noting "more analysis was needed to determine if there is still a need for treatments in that area that was left behind"). And, more to the point, it nowhere indicates that, even if some sort of project was likely, the same treatments proposed in the Draft EA would be carried forward in any proposal. To the contrary, the email notes that although "early indications are that there is still a need for treatments post-fire," and it was "likely that Midnight will be developed as a project," any "proposed action" would be updated "to reflect the changes from the fire and suppression efforts," with the NEPA process starting "from the beginning." AR11381. As such, Plaintiff's claim that "Defendants had fully analyzed the effects of the treatments proposed for the Midnight project area in the Draft EA" is simply wrong. Pl.'s Resp. 16. Those treatments had not yet been developed, much less proposed and subjected to scoping under NEPA.

This all stands in stark contrast to the Final EA's treatment of the Twisp Aquatic Restoration Project. As the Final EA documented, the Forest Service determined that the Cedar Creek fire "did not change the need for [aquatic habitat enhancement] treatments or baseline conditions used to analyze effects." AR12595. These treatments were then separately approved through another project called the Twisp Aquatic Restoration Project, with project approval and implementation having been expected to occur in late April 2022. AR12595. Because the proposed treatments from this project were known and nearing approval, the Forest Service considered those "treatments and all related actions as reasonably foreseeable future actions that will be addressed under cumulative effects as needed in specialists' reports." AR12595.

In short, the Final EA properly considered a potential project's cumulative effects where that project was reasonably foreseeable. But NEPA did not require the Final EA to consider the potential effects of undetermined treatments from an

inchoate project that had not proceeded to scoping.

### C. The Forest Service Satisfied NEPA's Public Participation Requirements.

Plaintiff claims that a revised Draft EA should have been prepared following the Cedar Creek fire and before issuance of the Final EA. Pl.'s Resp. 17-18. But this claim ignores that draft EAs are not required in the first instance so long as an agency has provided "the public with sufficient environmental information, *considered in the totality of circumstances*, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952-53 (9th Cir. 2008) (emphasis added).

Defendants' opening brief explained that the totality of the circumstances showed the Forest Service provided the public with more than enough information to foster informed participation throughout the planning process, from scoping through the resolution of objections. Defs.' Br. 29-31. Although the proposed action was reduced in size from the Draft EA and Final EA, the proposed activities and analysis of effects in the reduced area in the Final EA remained similar to those proposed in the Draft EA. *See* AR12594-97 (explaining changes between Draft EA and Final EA). As a result, despite Plaintiff's apparent confusion as to the relevance of such information, Pl.'s Resp. 17, the pre-fire opportunities for public participation and disclosure of environmental information are important to understanding the totality of the circumstances, as NEPA requires. And beyond that, as Defendants previously explained, the Forest Service provided ample information and opportunity for public participation following the Cedar Creek fire. *Id.* at 30-31. Despite Plaintiff's conclusory arguments to the contrary, this all more than satisfied NEPA's public participation requirement.

### D. The FONSI was not Arbitrary or Capricious.

Plaintiff continues to insist that an EIS is required anytime a project is

intended to improve forest resiliency and protect the public by reducing the potential for high-intensity wildfire. Pl.'s Resp. 20. As explained in Defendants' opening brief, that is not the case. Instead, courts have routinely upheld the preparation of EAs for projects materially similar to the Project. Defs.' Br. 32.

Plaintiff now maintains that "none of those cases appear[s] to involve a purpose and need statement that expressly incorporates public safety along the WUI." Pl.'s Resp. 20. But to the extent that is true, it is a distinction without a difference, as all the projects in those cases were intended to protect the public by reducing the potential for high-severity wildfires. *See also Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010) (upholding EA for forest restoration project the primary purpose of which was to reduce "the risk of wildfires to local residents"). Further, it ignores that courts have upheld the use of categorical exclusions (i.e., have not even required an EA, much less an EIS) to approve projects intended to reduce wildfire intensity and promote wildfire responsiveness in the WUI. *See, e.g.*, *All. for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1123, 1125-29 (D. Mont. 2013) (upholding use of categorical exclusion for project that would thin stands in WUI), *aff'd by* 639 F. App'x 498 (9th Cir. 2016). Plaintiff cannot and has not shown that an EIS is required for a project anytime it is intended to protect the public by reducing wildfire intensity and improving the ability of firefighters to respond to wildfire. Indeed, any such holding would severely hamstring the Forest Service's ability to proactively develop and implement projects that are intended to protect the public from the ever-increasing intensity and severity of wildfire. No court has ever required such an approach, and this Court should not be the first.

Finally, Plaintiff seems to maintain that the effectiveness of thinning to reduce wildfire intensity is always highly controversial, requiring the preparation of an EIS. Pl.'s Resp. 20-21. But Plaintiff's reliance on *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020), for such a proposition is misplaced. The

court in *Bark* faulted the Forest Service for not explaining why the variable density thinning at issue in that case, which would thin "selected trees of all sizes" throughout the project area, was not highly controversial in light of what the court described as "considerable scientific evidence" and "[s]ubstantial expert opinion" disputing the efficacy of such an approach to reduce wildfire intensity. *Id.* at 870.

Here, Plaintiff points to no similar evidence to question the Forest Service's reasoned conclusion that the Project's combination of understory thinning, overstory treatments, and fuels reduction activities will improve the resiliency of the forest, reduce the intensity of wildfires in the area, and facilitate firefighters' ability to effectively respond to wildfire. Indeed, to support the supposed highly controversial effects of the Project, Plaintiff cites only to its own comments. Pl.'s Resp. 21 (citing AR10553-54). Those comments, however, reference no scientific studies or expert opinions, and instead include general statements as to the Project's efficacy based on the commenter's "three years [sic] experience and training in fire behavior and as a wildland firefighter." AR10553. These statements fall far short of the considerable scientific evidence or substantial expert opinion *Bark* requires.

Moreover, the Forest Service fully supported the Project's efficacy through reliance on the relevant scientific literature and well-established modeling of fire behavior. As the Forest Service explained:

> a large amount of research has assessed the effectiveness of fuel treatments on changing fire behavior and fire severity, both empirically (Pollet and Omi 2002; Prichard et al. 2020) and using simulation modelling (Johnson et al. 2011). Current evidence suggests that a combination of mechanical thinning, followed by prescribed fire will restore important forest vegetation characteristics, increase resilience to wildfires, and decrease fire hazard (Skinner 2005; Schwilk et al. 2009; Kalies and Kent 2016; Prichard et al. 2020).

AR11582. And as the Forest Service further explained in response to comments:

> Although there is evidence that overstory thinning without treatment of the surface fuels could increase fire hazard through changes in

microclimate (surface wind speed and fuel moisture) and increases in surface fuel loading from slash (Weatherspoon 1996; Stone et al. 2008; Whitehead et al. 2008), a combined surface fuel treatment as proposed by this project should result in an overall reduction in expected fire behavior and fire severity (Agee and Skinner 2005). Both empirical evidence and fire behavior modelling suggest that the differences in dead fuel moisture and wind speed between untreated and thinned stands are either non-existent or so minor that their effects on potential fire behavior may be inconsequential (Faiella and Bailey 2007; Bigelow and North 2012). These findings are corroborated by substantial evidence indicating that a combination of mechanical thinning, followed by prescribed fire is the most effective means of decreasing fire behavior and fire severity (Schwilk at al. 2009; Prichard et al. 2020) and observations of fire behavior dramatically decreasing when moving from closed canopy conditions into fuels treatments with open, thinned canopies (Graham et al. 2009; Hudak et al. 2011; Kennedy and Johnson 2014; Johnson and Kennedy 2019).

AR11584-85; *see generally* AR11575-621 (fire and fuels report assessing effects on fuels in relation to fire behavior, discussing intensity factors, and citing relevant scientific literature); AR12510-64 (silviculture report assessing effects on forest).

Plaintiff cites no evidence, much less substantial scientific evidence, that questions the Forest Service's approach or suggests the effects of the Project are highly controversial. As such, *Hapner* is controlling. There, the court found that the effects of thinning and other actions to reduce likely fire intensity were supported by studies and modeling and were not highly controversial. 621 F.3d at 1244-45. The same is true here. *See also Earth Island Institute v. Muldoon*, --- F.4th ---, 2023 WL 5921619, at *11-13 (9th Cir. Sept. 12, 2023) (finding science supported thinning projects and rejecting claim that *Bark* "compels us to conclude that thinning of the sort at issue here is highly controversial").

## II.    CONCLUSION

As stated above and in Defendants' memorandum in support of their cross-motion for summary judgment, the Court should grant summary judgment on all claims in favor of Defendants and deny Plaintiff's motion for summary judgment.

Respectfully submitted this 12th day of October, 2023.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Phone: (206) 526-6881
shaun.pettigrew@usdoj.gov

*Counsel for Defendants*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
U.S. Department of Justice