FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 17, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NORTH CASCADES CONSERVATION COUNCIL,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES FOREST SERVICE, a federal agency of the United States Department of Agriculture, and KRISTIN BAIL, in her official capacity as Forest Supervisor, Okanogan-Wenatchee National Forest, United States Forest Service,<br><br>        Defendants. | No. 2:22-CV-00293-SAB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court are the parties' Cross-Motions for Summary Judgment, ECF Nos. 15, 17. A hearing was held on November 30, 2023, by videoconference. Plaintiff was represented by William H. Sherlock. Defendants were represented by Shaun Pettigrew. After hearing oral argument, the Court took the matter under advisement.

After reviewing the parties' submissions and considering the arguments made at the hearing, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

//

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 1**

## Facts

On November 23, 2023, Plaintiff filed this action, challenging the United States Forest Service's ("Forest Service") authorization of the Twisp Restoration Project ("TRP"). Plaintiff asks the Court to declare that Defendants violated NEPA and its implementing regulations in designing, analyzing, and implementing the TRP and the related Finding of No Significant Impact ("FONSI") and vacate the TRP Environmental Assessment ("EA) and FONSI.[1]

In November 2012, the Forest Service finalized a document titled "The Okanogan-Wenatchee National Forest Restoration Strategy: Adaptive Ecosystem Management to Restore Landscape Resiliency"[2] (Restoration Strategy). The Restoration Strategy identified the need for a concerted effort "to restore the sustainability and resiliency of forested ecosystems on the Okanogan-Wenatchee National Forest," in light of documented "(1) increased susceptibility to uncharacteristically large and severe fires; (2) uncharacteristically severe insect outbreaks; and (3) habitats . . . declining for late-successional and old forest associated species."[3] The Restoration Strategy explained that "while the Forest's aging road network provides needed access for recreation and forest management, it also degrades the condition of aquatic ecosystems."[4] To improve forest resilience and aquatic ecosystems on the Forest, the Restoration Strategy promoted a "planning approach based on principles of landscape-level restoration ecology."[5]

---

[1] Plaintiff also brought a claim under the Federal Advisory Committee Act (FACA). Plaintiff waived its FACA claim when it moved for summary judgment on the NEPA claim only.

[2] AR5890-6009.

[3] AR5895

[4] Id.

[5] Id.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 2**

In April 2019, the Forest Service completed the Twisp Landscape Evaluation ("TLE"), covering six watersheds in the greater Methow Valley in Okanogan County, Washington. The TLE concluded there was an urgent need for ecological restoration projects, given the "widespread degradation of forest, rangeland, watershed condition and stream habitat" and "increased [] risks of uncharacteristically severe wildfire."[6]

In June 2019, the Forest Service created a fourteen-member interdisciplinary team ("IDT") to develop a restoration project in a 79,682-acre region of the Methow Valley Ranger District. The goal of the project would be to move the landscape toward more resilient desired future conditions by (1) changing the vegetation composition, structure, and pattern to intersect with the historic and future ranges of variability as defined in the Restoration Strategy and other sources; (2) reducing the potential for high intensity wildfires in the wildland urban interface (WUI); and (3) designing and maintaining forest infrastructure, including roads, to reduce water quality impacts and maintain healthy, functioning watersheds that provide high quality water, air, and fishery habitat.[7]

In November 2019, a scoping letter was sent to 362 individuals, groups, and agencies detailing the proposed project, scheduling a public open house, and inviting comments on the proposal. The proposed project covered a 77,0380-acre area "southwest, west and northwest of Twisp, Washington in the Twisp River, Alder Creek, Rader Creek, and Wolf Creek drainages."[8] The proposed project included closing or decommissioning roads, replacing culverts, reestablishing aquatic connectivity, introducing coarse woody debris and engineered log jams to aquatic habitat, thinning of tree stands, prescribed fire treatments, and removal of

---

[6] AR6844.

[7] AR6906.

[8] AR7003.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 3**

hazard trees. It also included commercial and noncommercial thinning and prescribed fire treatments. The proposed project stated that most of the thinning and prescribed fire treatments would use a "condition-based management strategy." The proposed project explained that condition-based management involved developing a suite of proposed treatments based on pre-identified management requirements and specific resource conditions across a broad area and applying the most appropriate treatments to obtain the desired conditions based on pre-implementation field reviews. The Forest Service received responses to the scoping letter from 55 individuals, organizations, businesses, and local governments.

In October 2020, the Forest Service issued a Draft Environmental Assessment ("EA"). After the release and closure of the comment period, the Forest Service hosted a virtual open house and facilitated a self-guided tour of the project area. Ultimately, the Forest Service received 1,029 comments to the Draft EA.

In August 2021, the Cedar Creek Fire burned into the northern portion of the TRP area, causing mild to severe fire effects in the Wolf, Rader, and Little Bridge Creek drainages. In response to the Cedar Creek Fire, the Forest Service revised the proposed action to omit areas potentially affected by the Fire.

In January 2022, the Forest Service held a public meeting in which the revisions to the TRP were explained. Additionally, the Forest Service provided a public link to the meeting and materials used, summarized the major changes to the proposed action and provided an update on the status of the Final EA.

In April 2022, the Forest Service released the Final EA and a draft Decision Notice and Finding of No Significant Impact (DN/FONSI). The revised proposed action reduced the project area to 24,140 acres. The Final EA's proposed action provided for non-commercial understory vegetation thinning on up to 13,812 acres and commercial overstory vegetation treatments on up to 8,151 acres.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 4**

The TRP provided that no overstory treatments would occur in late successional reserves (LSR),[9] with condition-based thinning on up to 7,275 acres of matrix lands[10] and site-specific treatments for the remainder on matrix lands and in riparian reserves.[11] The diameter cap on overstory thinning on matrix lands was reduced from thirty inches ("large" trees) to twenty-one inches ("medium" trees). Fuel reduction through piling, pile burning, and underburning would occur on at most 23,167 acres, with 102.6 miles of associated fire line construction. The proposed action would address transportation management by removing hazard and danger trees, replacing culverts, and road construction, maintenance, and closures. Although there would still be some aquatic habitat enhancement measures, most of that work became a separate project entitled the Twisp Aquatic Restoration Project.

The Forest Service received objections during the 45-day commenting period, which were discussed with the Acting Deputy Regional Forester on July 12, 2022. Written responses to the objections were provided.

On July 20, 2022, the Forest Supervisor adopted the proposed action in the

---

[9] LSRs are intended to "maintain a functional, interactive, late-successional and old-growth forest ecosystem" that will "serve as habitat for late-successional and old-growth related species, including the Northern Spotted Owl." AR3957.

[10] Matrix lands are lands outside the reserves and the other land-use allocations "in which most timber harvest and other silvicultural activities will be conducted." AR3957.

[11] Riparian reserves are areas along all streams, wetlands, ponds, lakes, and unstable or potentially unstable areas where the conservation of aquatic and riparian-dependent terrestrial resources receives primary emphasis. Their main purpose is to protect the health of the aquatic system and its dependent species. AR3958.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 5**

Final EA as the TRP in the final DN/FONSI. The FONSI concluded that an Environmental Impact Statement was not required because it would not "have a significant effect on the quality of the human environment."[12]

## Law

### A. Administrative Procedures Act

Under the Administrative Procedures Act (APA) a reviewing court shall not set aside an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(A)(2). Agency action is arbitrary and capricious if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Review under this standard is narrow and a district court cannot substitute its judgment for that of the agency. *Ecolog Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citation omitted).

Section 101 of NEPA declares a broad national commitment to protecting and promoting environmental quality. 42 U.S.C. § 4331. NEPA does not mandate a particular result, but simply prescribes necessary process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. *Id.*

//

---

[12] AR12843.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 6**

B. **National Environmental Policy Act**

NEPA imposes procedural requirements designed to force agencies to take a "hard look" at the environmental consequences of their proposed actions. *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). To satisfy the "hard look" requirement, an agency must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.*

The NEPA review process concludes in one of two ways: (1) the agency determines through an Environmental Assessment that a proposed action will not have a significant impact on the environment and issues a Finding of No Significant Impact, or (2) the agency determines that the action will have a significant impact and issues an Environmental Impact Statement and record of decision. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt*, 36 F.4th 850, 868 (9th Cir. 2022).

To determine whether an agency has complied with NEPA's requirements, courts apply a rule of reason, which involves a pragmatic judgment on whether the form, content and preparation of the agency's assessment foster both informed decision-making and informed public participation. The presumptive remedy for violation of NEPA and the APA is vacatur. 5 U.S.C. § 706; *350 Montana*, 50 F.4th at 1259.

As the Ninth Circuit recently noted, "[i]t is always possible to quibble with an agency's explanation; a motivated litigant will be able to identify parts of any agency explanation that could have been more precise or thorough. But the arbitrary and capricious standard does not demand perfection." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023).

## Analysis

In its motion for summary judgment, Plaintiff makes the following arguments challenging Defendants' Final EA and FONSI: (1) the Final EA failed to analyze a reasonable range of alternatives and relied on an unreasonable narrow

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 7**

purpose and need statement.; (2) the Final EA failed to fully disclose the direct, indirect, and cumulative impacts of the TRP; (3) the NEPA process failed to allow meaningful public participation and failed to adequately inform the public about the TRP; and (4) the Forest Service violated NEPA by failing to prepare an Environmental Impact Statement. ECF No. 15. Plaintiff characterizes the TRP as a massive commercial logging project.

In its motion for summary judgment, Defendants make the following arguments: (1) the stated purpose and need for the project was not unreasonably narrow and the Final EA considered a reasonable range of alternatives; (2) the Final EA took a hard look at the project's potential impacts; (3) they satisfied NEPA's public participation requirements; and (4) the FONSI was not arbitrary and capricious. ECF No. 17.

### 1. Purpose and Need / Range of Alternatives

#### a. Purpose and Need

NEPA requires an agency to specify the underlying purpose and need for the proposed action. 40 C.F.R. § 1502.13.[13] "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quotation and citation omitted.) That said, agencies have considerable discretion in defining the purpose and need of a project. *Id.* at 866. Thus, courts evaluate the Statement of Purpose and Need under the reasonableness standard. *Id.*

---

[13] Relying on 40 C.F.R. § 1506.13 (2020), The Forest Service informed the Court at oral argument that the decision notice for the TRP applied the 1978 regulations because the scoping for the project predated September 2020. Thus, the citations to the Code of Federal Regulations in this Order refer to pre-2020 regulations, unless otherwise denoted.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 8**

Beginning with the scoping and ending with the Final EA, the Forest Service identified five needs that the TRP project would address. These included protecting and maintaining aquatic resources and improving watershed resiliency, remedying past forest management by moving the forest toward a more resilient condition consistent with historic and future ranges of variability, enhancing wildlife habitat, reducing fire intensity while creating conditions to safely manage wildfire in the WUI, and managing the transportation system in an affordable, safe, and efficient manner.[14]

Plaintiff argues the TRP relied on an unreasonable narrow purpose and need statement, but it did not identify which of the five state goals were too narrow or unnecessary. Rather, Plaintiff asserts that by defining the project with these five goals, Defendants manipulated the process to maintain a specific preordained project.

Here, Defendants reasonably defined the purpose and need of the Project. Plaintiff has not shown that the five needs, collectively or individually, preordained a specific project. Notably, the TRP authorizes a variety of strategies to meet the stated needs, including non-commercial understory thinning, commercial overstory treatments and fuel reduction through piling, pile burning and underburning. Only the commercial overstory treatment involve the kind of commercial timber harvest that Plaintiff suggests the statement of needs preordained.

### b. Reasonable Range of Alternatives

Consideration of alternatives "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives [to the proposed action], and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The "touchstone" is

---

[14] AR12600-04.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 9**

"whether [the] selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist.* 376 F.3d at 872 (quoting *State of Calif. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)). The agency's decision "cannot be found wanting simply because the agency failed to include every alternative device thought conceivable by the mind of man." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 551 (1978). "Nor does NEPA require agencies to evaluate 'mid-range' alternatives between action and no action." *Earth Island Inst. v. U.S.F.S.*, 87 F.4th 1054, 1065 (9th Cir. 2023). An agency does not violate NEPA simply because it considered only two alternatives—action and no action. *Id.* Still, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist.*, 376 F.3d at 868 (citation omitted).

Courts review the agency's range of alternatives under the "rule of reason." *Id.* Under the rule of reason, the EA need not consider an infinite range of alternatives, only reasonable or feasible ones. *Id.* (citation omitted). Additionally, "an agency is not required to undertake a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Id.* (citation omitted).

Plaintiff argues the reasons the Forest Service advanced for eliminating viable alternatives were arbitrary and capricious. For example, one of the eliminated alternatives would have been to use a narrower maximum tree diameter than the eventual 21-inch maximum. Plaintiff argues there was no indication in the Final EA how the Forest Service reached that conclusion. Another example is the elimination of the "natural succession" alternative without reasonable justification.

Here, the Final EA considered in detail a no-action alterative and an action alternative and explained in detail why other proposed alternatives were not considered. The Final EA provided adequate explanations as to why the additional proposed alternatives did not meet the needs of the Project. The Final EA's

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 10**

consideration of alternatives satisfies NEPA.

### 2. Cumulative Impacts

An EA may be deficient if it fails to include a cumulative impact analysis. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002).[15]

Plaintiff argues the Forest Service failed to account for the potential cumulative impacts of the Midnight Restoration project. Defendants counter that the Forest Service is still assessing the effects of the Cedar Creek Fire to determine whether previously identified or new treatments would be beneficial and if so, whether to initiate new projects and analyses to cover these areas.

The record indicates that at the time the Final EA was issued, the Midnight Restoration Project had not passed the NEPA scoping stage. Contrary to Plaintiff's assertions, Defendants had not fully analyzed the effects of the treatments proposed for the Midnight project area. As such, the EA was not required to consider the cumulative impacts of a project that had not even proceeded to scoping.

### 3. Meaningful Public Participation

A key aim of NEPA is to ensure that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). However, NEPA does not require agencies to circulate a draft EA in every case. *Earth Island Institute*, 87 F.4th at 1067; *see also Block*, 690 F.2d at 771

---

[15] "Cumulative impact" is the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 11**

(cautioning that "requiring agencies to repeat the public comment process when only minor modifications are made promises to prolong endlessly the NEPA review process"). What is required is that agencies "provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id.* (quotation omitted).

Plaintiff argues that a revised Draft EA should have been prepared following the Cedar Creek Fire and before issuance of the Final EA. Additionally, Plaintiff argues that the public participation was hampered by the Forest Services' use of condition-based management.

Here, the Forest Service provided the public with adequate opportunity to meaningfully participate in the process during the development of the Project. The Forest Service estimated stand characteristics throughout the Project Area, identified which of those stands may be thinned or otherwise treated, detailed the prescription that would apply to the thinning or treatment in each area, as well as assessing the potential effects of those actions.

Moreover, it was not necessary to reopen the public comment period before releasing the Final EA after the Cedar Creek Fire burned through a portion of the originally proposed Project area. The public was provided with sufficient environmental information, considering the totality of the circumstances, to allow members of the public to weigh in with their views, thus, informing the agency decision-making process. After the Cedar Creek Fire, the Forest Service presented information at a public meeting before issuing the Final EA. The Forest Service considered the comments and objections to the Final EA and the draft DN/FONSI prior to approving the Project.

In this case, the Forest Service met the requirements of NEPA by permitting informed public participation.

**4. Environmental Impact Statement**

NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for major federal decisions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An agency is required to prepare an EIS where there are substantial questions about whether a project may cause significant degradation of the human environment. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

Whether a project is significant depends on both the project's context and its intensity. 40 C.F.R. § 1508.27. Context means "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." § 1508.27(a). Both short- and long-term effects are relevant to context. *Id*.

One of the factors to consider is whether the project is "highly controversial." A project is highly controversial if there is a substantial dispute about the size, nature, or effect of the major federal action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010). Mere opposition to the agency's proposed action is insufficient to demonstrate a controversy. *Native Ecosystems Council*, 428 F.3d at 1240. But where substantial evidence in the record suggests that a project may have highly controversial environmental effects, the agency must at the very least explain why it will not. *Earth Island Inst*., 82 F.4th at 638. If the agency concludes that an EIS is not necessary, it must provide a "convincing statement of reasons to explain why project's impacts are insignificant." *350 Montana*, 50 F.4th at 1259.

An Environmental Assessment (EA) is used as a screening document to determine whether an agency must prepare an EIS or make a finding of no significant impact (FONSI). 40 C.F.R. §§ 1508.9, .13. In examining the EA, courts look to whether the EA has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment; and courts also look at whether its

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 13**

determination that no EIS is requires is a reasonable conclusion. *350 Montana*, 50 F. 4th at 1265 (quotation omitted). "Federal agencies must undertake a 'full and fair' analysis of the environmental impacts of their activities." *Id.* (quotation omitted).

An agency may issue a FONSI only if, after reviewing the direct and indirect effects of a proposed action, it concludes the action "will not have significant effect on the human environment." 40 C.F.R. § 1508.13. The Statement of Reasons "is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Center for Cmty. Action and Env. Justice v. Fed. Aviation Ad.*, 61 F.4th 633, 639 (9th Cir. 2023).

Plaintiff maintains—in light of the truly vast scale of the TRP, the lack of critical information, and the other condition-based management projects that the agency has in the works, particularly the Midnight project—it is necessary that the Forest Service prepare an EIS. Additionally, the Final EA and FONSI are unsupportable.

In this case, the Final EA discloses the project area and where within the project area vegetation treatment and fuel reduction treatment are authorized, identifies specific prescriptions that apply to each authorized activity, and explains the anticipated timing of implementation of those activities. It also details the decision criteria that will be applied to determine what to do when the ground conditions may differ from the expected conditions, thereby disclosing to the public the maximum potential effects of the project. By doing so, the Final EA is consistent with NEPA"s requirements.

The Forest Service's FONSI was not arbitrary or capricious. The FONSI and supporting documents fully explain the basis for the Forest Service's conclusion that the Project would not have a significant effect on the quality of the human environment. Plaintiff has failed to identify any significant effects that the Project will have on any Endangered Special Act-listed species. Moreover, the Court

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 14**

declines to find, as a matter of law, that if a project is going to have a significant impact on reducing fire intensity and proximity to urban areas it must be analyzed under the framework of an EIS. Plaintiff has not provided any caselaw to support this contention.

At the heart of Plaintiff's challenge is the Forest Service's use of condition-based management. Plaintiff has not shown that this approach violates NEPA as a matter of law. Here, the Final EA disclosed detailed decision criteria that will be applied during the TRP implementation to ensure the actual conditions on the ground meet the expected conditions disclosed in the Final EA. If they do, the approved treatment will be applied. If they do not, the treatment will not be applied.

In this case, the Final EA's description of condition-based management details the decision criteria for each approved activity, specific prescriptions that will be applied if those decision criteria are met, maps identifying where those prescriptions would be applied, and estimates of the timing of implementation.[16] Additionally, the TRP also provides for implementation of various design features, monitoring and mitigation measures. The Court finds that the use of condition-based management is not arbitrary or capricious as a matter of law and as applied in this case.

The Final EA provides sufficient information to the public to understand the scope of the TRP and its potential environmental consequences and meets NEPA's requirements for informed decision-making before an agency's proposed action.

**5. Conclusion**

The TRP is a 24,000-acre project within the Okanogan-Wenatchee National

---

[16] AR12616-24, AR12718-32, AR12816-22.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 15**

Forest, which is over 3 million acres.[17] It is one component of a larger strategy on the part of the Forest Services to create a forest that is more resilient to insect and disease infestation and catastrophic wildfire. It is also the result of careful decision-making on the part of the Forest Service that included more than three years of planning, public participation, environmental analysis and consultation with tribes and other government agencies.

In this case, the Forest Service met all the requirements of NEPA in approving the TRP. The Forest Service took a "hard look" by providing a reasonably thorough discussion of the significant aspects of the probable environmental consequences.

//
//
//
//
//
//
//
//
//
//
//
//

---

[17] The Okanogan-Wenatchee National Forest encompasses more than 3.8-million acres in Washington state and stretches north to south from the Canadian border to the Goat Rocks Wilderness - a distance of about 180 miles. https://www.fs.usda.gov/main/okawen/about-forest, last visited on December 19, 2023.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 16**

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment, ECF No. 15, is **DENIED**.

2. Defendants' Motion for Summary Judgment, ECF No. 17, is **GRANTED**.

3. The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff.

**IT IS SO ORDERED**. The Clerk of Court is directed to enter this Order, forward copies to counsel, and close the file.

**DATED** this 17th day of January 2024.



Stanley A. Bastian
Chief United States District Judge

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 17**